CORRECTED

2023-2060

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

LA MOLISANA, S.P.A., VALDIGRANO DI FLAVIO PAGANI S.R.L.
*Plaintiff-Appellants*

v.

UNITED STATES

*Defendant-Appellee.*

Appeal from the United States Court of International Trade in No. 21-cv-00291, Sr. Judge Richard K. Eaton

Brief of Plaintiff-Appellants
LA MOLISANA, S.P.A.
VALDIGRANO DI FLAVIO PAGANI S.R.L.

DAVID J. CRAVEN
CRAVEN TRADE LAW LLC
3744 N Ashland Avenue
Chicago, Illinois 60613
Tel. 773-709-8506
David.craven@tradelaw.com
Counsel to Plaintiff-Appellants

September 26, 2023

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2023-2060

**Short Case Caption** La Molisana, S.p.A., Validgrano di Flavio Pagani S.R.L., v.

**Filing Party/Entity** La Molisana, S.p.A. , Valdigrano di Flavio Pagani S.R.L.

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 7/24/2023

Signature: /s/ David J. Craven

Name: David J. Craven

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br>☐ None/Not Applicable |
| La Molisana S.p.A. | | F.lli Ferro - Semolerie Molisane SRL |
| Valdigrano di Flavio Pagani S.R.L. | | None |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS


Certificate of Interest .......... i

Table of Contents .......... iv

Table of Authorities .......... vi

Statement of Related Cases .......... 1

Statement of Jurisdiction .......... 2

Statement of the Issues .......... 4

Statement of the Case .......... 5

Statement of Facts .......... 7

Summary of Argument .......... 11

Standard of Review .......... 12

Argument .......... 15

A) Commerce Cannot Ignore the Impact of the FDA Nutrition Rounding Rules .......... 15

B) Commerce Cannot Refuse to Adjust the Protein Content For Scalar Differences And Such Refusal Is Not Supported By Substantial Evidence .......... 19

C) Commerce's Protein Coding Causes Physically Dissimilar Products in The Two Markets to Be Treated as Identical, And Causes Physically Identical Products to Be Treated as Dissimilar .......... 23

D) Commerce's Treatment of the Protein Coding is Unsupported by Substantial Evidence .......... 30

1. Contrary to Commerce's Position, Pasta with a Protein Content of 12.5% is Standard Pasta in Both the United States and Italy .......... 30

2. Contrary to Commerce's Position, the Minimum Protein Requirement for Premium Semolina is 13.5% .......... 42

Conclusion and Claim for Relief .......... 43

Statutory Addendum

Judgment Order .......... a

Slip Op. .......... b

Proof of Service .......... c

Certificate of Compliance .......... d

## *TABLE OF AUTHORITIES*

***Court Cases***:

*ArcelorMittal Stainless Belg. N.V. v. United States*, 694 F.3d 82, 88 (Fed. Cir. 2012) .......... 5

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (1984) .......... 18, 41

*American Lamb Co. v. United States*, 785 F.2d 994 (Fed. Cir. 1986) .......... 14

*Carpenter Technology, et al. v. United States*, 662 F.Supp.2d 1337 (2009) .......... 14

*Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984) .......... 13

*China National Arts and Crafts Import and Export Corp., Tianjin Branch v. United States,* 771 F. Supp. 407 (Ct. Int'l Trade 1991) .......... 40

*Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) .......... 41

*Fagersta Stainless AB v. United States*, 577 F. Supp. 2d 1270, 1275 (Ct. Int'l Trade 2008) .......... 27, 28, 38

*Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) .......... 41

*Jinan Yipin Corp. v. United States*, 637 F.Supp.2d 1183 (2009) .......... 14, 18

*Matsushita Elec. Indus. Corp. v. United States*, 750 F.2d 927, 936 (Fed. Cir. 1984) .......... 41, 43

*Micron Tech., Inc. v. United States*, 117 F.3d 1386 (Fed. Cir. 1997) .......... 13

*Mitsubishi Materials Corp. v. United States*, 17 C.I.T. 301, 304, 820 F. Supp. 608, 613 (1993) .......... 41

*Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1344 (Fed. Cir. 2016) .......... 5, 21

*Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006) .......... 40, 41

*Pesqueara Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1379-80 (Fed. Cir. 2001) .......... 14, 37

*Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 Fed. Cir. 1990) .......... 5

*Saha Thai Steel Pipe Co., Ltd. v United States*, 828 F. Supp. 57, 64 (Ct. Intl Trade 1993) .......... 5

*Shakeproof Assembly Components Div. of Ill. Tool Works v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001) .......... 5

*Taian Ziyang Food v. United States*, 637 F.Supp.2d 1093 (2009) .......... 14

*Timex V.I. Inc. v. United States*, 157 F.3d 879 (Fed. Cir. 1988) .......... 13

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013) .......... 5

*Zenith Radio Corp. v. United States*, 437 U.S. 443 (1978) .......... 14

***Laws:***

19 U.S.C. §1516a .......... 2

19 U.S.C. §1516a(b)(1)(B)(i) (2006) .......... 13

19 U.S.C. §1677(16)(A) .......... 23, 24, 28

19 U.S.C. §1677(16)(B) .......... 27, 38

28 U.S.C. §1295(a)(5) .......... 2

28 U.S.C. §1581(c) .......... 2

28 U.S.C. §§ 2107(b) and 2654(c) .......... 2

The Nutrition Labeling and Education Act, PL 101-535 (1990) .......... 15,16

***Regulations:***

21 C.F.R. 101.1 .......... 15

21 C.F.R. 101.9 .......... 15

***Administrative:***

*Pasta from Italy*: *Antidumping Duty Order*, 61 Fed. Reg. 38,547 (Dep't Commerce July 24, 1996) .......... 5

*Pasta From Italy: Final Results of 15th Antidumping Duty Administrative Review, Final No Shipment Determination and Revocation of Order, in Part; 2010–2011*, 78 Fed. Reg. 9,364 (Dep't Commerce Feb. 8, 2013) .......... 23

***Other:***

Federal Circuit Rule 47.5 .......... 1
Rule 4 of the Federal Rules of Appellate Procedure .......... 2

## *STATEMENT OF RELATED CASES*

Pursuant to Federal Circuit Rule 47.5 Plaintiff-Appellants La Molisana, S.P.A. and Valdigrano Di Flavio Pagani state:

1. There have been no other appeals from this civil action or proceeding in the lower court to the U.S. Court of Appeals for the Federal Circuit or any other Appellate Court.

2. Plaintiff-Appellants are not aware of any other matter presently pending at the U.S. Court of International Trade which could be directly affected by the decision in this pending appeal.

## *STATEMENT OF JURISDICTION*

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1295(a)(5) which confers on the U.S. Court of Appeals for the Federal Circuit exclusive jurisdiction of appeals from final decisions of the U.S. Court of International Trade.

2. This matter is an appeal of a final determination and order by the United States Court of International Trade ("CIT"). Jurisdiction was proper before the U.S. Court of International Trade pursuant to 28 U.S.C. §1581(c). This provision of law confirms on the CIT exclusive jurisdiction over any civil action commenced under section 516A of the Tariff Act of 1930, as amended. (19 U.S.C. §1516a).

3. This appeal is timely. Rule 4 of the Federal Rules of Appellate Procedure and 28 U.S.C. §§ 2107(b) and 2654(c) permit any party to file a Notice of Appeal within 60 days after entry of a judgment in a civil case to which the United States is a party. The United States was a party to the case before the CIT. The CIT's Slip Opinion was issued on April 24, 2023[1] (APPX000036-000050) and the final Judgment was issued on April 24, 2023 (APPX000051.)

[1] Pursuant to the Court's rules, citations to record documents included in the Joint Appendix are cited herein as "APPX_".

Plaintiff-Appellants La Molisana, S.P.A. and Valdigrano Di Flavio Pagani filed a notice of appeal during the 60-day period after entry of judgment. This appeal was timely filed within the 60-day period after entry of judgment. (APPX000006)

## *STATEMENT OF THE ISSUES*

1. Whether the U.S. Department of Commerce abused its discretion by failing to take into account the impact of FDA mandated rounding in determining the reported values on nutrition fact labels resulting in classification of identical product under different protein codes and thus different CONNUM's solely the result of the FDA mandated rounding rules.

2. Whether the U.S. Department of Commerce abused its discretion when it failed to properly take into account the protein content in the physical characteristics of the subject merchandise in La Molisana's sales and cost databases.

3. Whether the U.S. Department of Commerce abused its discretion when it failed to adjust the protein content reported in nutrition fact panels to a uniform standard, resulting in a comparison of dis-similar units.

4. Whether the U.S. Court of International Trade committed error by ratifying the action of the administering authority.

## *STATEMENT OF THE CASE*

There is an antidumping order on Certain Dry Pasta from Italy which was published as *Pasta from Italy*: *Antidumping Duty Order*, 61 Fed. Reg. 38,547 (Dep't Commerce July 24, 1996). This appeal concerns the 23rd administrative review, AR-23, *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 47,242 (Dep't Commerce Sept. 9, 2019) (APPX000545 to APPX00058)

The general rule is that the administering authority should calculate dumping margins as accurately as possible and use the best available information. *See Shakeproof Assembly Components Div. of Ill. Tool Works v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001); *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990); *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013). In *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1344 (Fed. Cir. 2016), the Court explained that a Commerce determination is "'accurate' if it is correct as a mathematical and factual matter…" (Emphasis added). To achieve this required accuracy, "antidumping orders should not be interpreted in a vacuum devoid of any consideration of the way the language of the order is used in the relevant industry." *ArcelorMittal Stainless Belg. N.V. v. United States*, 694 F.3d 82, 88 (Fed. Cir. 2012). *See also, Saha Thai Steel Pipe Co., Ltd. v United States*, 828 F. Supp. 57, 64 (Ct. Intl Trade 1993) (".. .the Department has honored one of the fundamental principles underlying the trade statute –

accuracy. It is this endeavor for accuracy … that lends respectability to U.S. trade statutes. .").

Contrary to the foregoing, the Court of International Trade upheld a dumping margin which was not accurate, which was not based on the best available information and which was based, in part, on a failure to convert certain values to the same units of measure.

Plaintiff-Appellants La Molisana, S.P.A. and Valdigrano Di Flavio Pagani and this appeal followed.

## *STATEMENT OF FACTS*

a. The antidumping order on pasta from Italy was published in 1996, *Pasta from Italy*: *Antidumping Duty Order*, 61 Fed. Reg. 38,547 (Dep't Commerce July 24, 1996).

b. This appeal concerns the 23rd administrative review covering the 2018/19 period of review, AR-23, *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 47,242 (Dep't Commerce Sept. 9, 2019).

c. Commerce issued its preliminary results as *Certain Pasta From Italy: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2018– 2019*, 85 Fed. Reg. 74,676 (Dep't Commerce Nov. 23, 2020) ("AR-23P"), accompanied by Commerce's *Decision Memorandum for Preliminary Results of Antidumping Duty Administrative Review: Certain Pasta from Italy; 2018-2019* (Nov. 17, 2020) ("AR-23 PDM"), APPX000052-000055.

d. In making its determination, Commerce must compare products in three databases, U.S. sales, home market (HM) sales, and cost of production. These data bases are linked by "computer control numbers" ("CONNUMs"), which categorize merchandise according to its physical

characteristics. Here, the CONNUM is a concatenation of the codes for six physical characteristics, namely,

| FIELD NAME | DESCRIPTION |
|---|---|
| SHAPE | Product shape |
| WHEATSP | Wheat species |
| MILLFORM | Milling form |
| PROTEIN | Percent protein content "as stated on the label of the respective product" |
| ADDIH | Additives |
| ENRICH | Enrichment |

e. The sole physical characteristic in dispute in this review is the coding for protein content, PROTEIN and the meaning of the term 12.5%.

f. The Department questionnaire requires the reporting of protein content based on the label. The questionnaire states: "Identify the percentage of protein in the pasta sold, as stated on the label of the respective product, as stated on the label of the respective product {*sic*}". (APPX001258). The Department does not independently define what constitutes a gram of protein.

g. La Molisana made multiple relevant submissions in this matter including a Section B and C questionnaire response ("§§BC QR") (Jan. 3, 2020) in which the specific issues with respect to protein were addressed. (APPX003053 and APPX003143 – 003147 and APPX003330 – 003334. )

h. Exhibit B-2 and C-2 of La Molisana's B&C response relates the details as to protein field of the physical characteristics that form the computer control number and thus the basis by which all three databases are compared. (APPX003143 – 003147 and APPX003330 – 003334.)

i. On April 8, 2020 La Molisana expressly requested that the Department respond to specific questions about protein content. (APPX004460 - 004461)

j. La Molisana requested that the Department allow it to file "alternative" data bases reflecting the alternate protein content, but the Department did not allow La Molisana to do so. The Department also expressly rejected the alternate databases filed by the other mandatory respondent. See Letter of Department of December 20, 2019 (APPX002979 - 002980)

k. The market report placed on the record by the other mandatory respondent in its section B response contains significant analysis of the protein content of the physical characteristics of pasta including the Protein Content. (APPX002143 – 002480.)

l. The market report establishes, based on actual purchases, that pasta with a protein content of 12.5% is standard pasta, and is in fact, the minimum accepted protein among supermarket sellers. (APPX002147.) The report

also establishes that pasta with a protein content of greater than 12.5% is consistently sold as a premium pasta. (APPX002147)

m. In its original implementation of the protein breakpoint, in AR-12,[2] Commerce relied solely on the practices of the Italian commodity exchanges, which classified semolina (the raw material for pasta) with a protein content of 12.5% or higher as premium semolina. The Department applied this raw material standard to the relevant product. However, during the present period of review, AR-23, the Bologna (Italy) commodity exchange set the minimum protein content for premium semolina at 13.5%. (APPX002359 – 002360) Thus, according to the Market Report, Commerce's 12.5% breakpoint no longer reflects the practice of the Italian commodity market.

n. Italy and the United States have different laboratory protocols for measuring the protein content of foodstuffs, and these protocols govern the protein ratios that are required to appear on the nutrition panel of foods sold at retail. Protein is calculated by counting units of nitrogen. In the

[2] *Pasta from Italy: Preliminary Results of Twelfth Antidumping Duty Administrative Review*, 74 Fed. Reg. 39,285 (Dep't Commerce Aug. 6, 2009) ("AR-12P") ; *Pasta from Italy: Final Results of Twelfth Administrative Review*, 75 Fed. Reg. 6,352 (Dep't Commerce Feb. 9, 2010) ("AR-12F"), ID Memo at comment 1 ("AR 12F IDM").

U.S. a gram of protein has 6.25 units of Nitrogen. (APPX002156) In Italy a gram of protein has 5.7 units of Nitrogen. (APPX002246 – 002268.)

o. Nutrition fact panels in the U.S. are based on a serving size of 56 grams, nutrition fact panels in Europe are based on 100 grams. This 12.5 percent protein content in the U.S. is based on a rounded value of 7 grams of protein while in Europe it would be 12.5 grams per 100 gram serving.

p. Pasta sold in Italy with a protein content of 12.5% on the label has a different *physical* protein content than pasta sold in the United States with a protein content of 12.5% on the label. Applying these standards, pasta with a protein content of 12.5% on an Italian label is physically identical to a pasta with a protein content of 11.4% on the label of a U.S. product[3].

q. Notwithstanding that this protein issue was raised at the onset of the review, the Department's preliminary determination makes no mention of the protein coding issue nor does it acknowledge the existence of the market report. (APPX000052- 000055)

[3] This is masked by the FDA Rounding rules.

## *SUMMARY OF ARGUMENT*

- A primary objective in calculating margins is on of accuracy. In order to calculate margins accurately, similar products should be compared with each other. Where the methodology does not result in the comparison of similar products, and results in the comparison of dis-similar products, and expressly precludes comparison of identical products, it is flawed and does not meet this primary objective.
- The Department's use of the protein content on a FDA nutrition fact panel to determine protein content does not take into account the different standards used in calculating the number of grams of protein is fatally flawed and results in the comparison of dissimilar products.
- The Department's use of the FDA nutrition facts panel, with the mandatory FDA rounding rules, is fatally flawed, and in fact makes it essentially impossible for any product to be classified as standard pasta in the U.S. Sales database. Where the selected methodology does not allow product to be classified in appropriate comparisons, it is necessarily unusable.

## *STANDARD OF REVIEW*

In reviewing judgments of the U.S. Court of International Trade, this Court "appl{ies} anew" the same statutory judicial review standard applied by the lower

court. See *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1559 n. 10 (1984); *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1392-93 (Fed. Cir. 1997). The standard of review, as set forth at 19 U.S.C. §1516a(b)(1)(B)(i) (2006), requires that:

> {t}he Court shall hold unlawful any determination, finding or conclusion found … to be unsupported by substantial evidence of record or otherwise not in accordance with law.
> 19 U.S.C. §1516a(b)(1)(B)(i) (2006)

In reviewing a question of law, this Court's deliberations are guided by the principles set forth in *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984). Under *Chevron*, a court reviewing an agency's interpretation of a statute must begin with the statutory test: "{i}f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842 (citations omitted). This court has further emphasized that a court must "carefully investigate the matter to determine whether Congress's purpose and intent on the question at issue {are} judicially ascertainable." *Timex V.I. Inc. v. United States*, 157 F.3d 879, 881 (Fed. Cir. 1988) (citing *Chevron*, 467 U.S. at 842-43 & n. 9).

If this Court finds that the statute is silent or ambiguous with respect to the specific question at issue, the question for the Court is whether Commerce's interpretation is based on a permissible interpretation of the statute. *Chevron*, 467 U.S. at 842. The agency's reasonable interpretations of its statutory responsibilities

are entitled to judicial deference. *Id.* at 844; *Pesqueara Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1379-80 (Fed. Cir. 2001). A reviewing court must accord substantial weight to the agency's interpretation of the statute is administers. See *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450-51 (1978); *American Lamb Co. v. United States*, 785 F.2d 994, 1001 (Fed. Cir. 1986).

Decisions of the Commerce Department must be based on "adequate reasoning." Simplistic or vague reasoning is inadequate. *Taian Ziyang Food v. United States*, 637 F.Supp.2d 1093 (2009) at 1126, 1140 and 1151; *Jinan Yipin Corp. v. United States*, 637 F.Supp.2d 1183 (2009) at 1189, 1192, 1196, 1197; *Carpenter Technology, et al. v. United States*, 662 F.Supp.2d 1337 (2009) at 1344 Application of legal and evidentiary standards of review to the agency's determination in this case demonstrate that Commerce's determinations in this matter were not in accordance with law and was not supported by substantial evidence and not based on adequate reasoning. The lower court's decision to sustain Commerce's decision under these standards was erroneous. This Court should remand this case to the lower court with instructions that it remand the matter to the administrative agency.

## *ARGUMENT*

A) Commerce Cannot Ignore the Impact of the FDA Nutrition Rounding Rules

When the Department required respondents to use the Nutrition Facts Panel values for reporting protein content, the Department failed to take into account the impact of FDA rounding rules on the physical values on the Nutrition panel. This bias exists even without making the scalar adjustments described in Section B below. While, at first glance, the Nutrition Facts Panel (NFP) would appear to provide sufficient information on which to base a protein content determination, the actual rounding rules and reporting requirements result in significant distortion. Critically, such rounding masks the true protein content and results in comparisons which are neither transparent nor consistent. In fact, such rounding makes it virtually impossible for product sold in the U.S. to be classified as Standard Pasta. Accordingly, due to rounding and the limitations of the NFP, the NFP does not, in fact, provide an accurate basis for determining the protein content of the pasta.

As part of an FDA initiative, standardized food labeling is now required for food products sold at retail. This standardized labeling includes requirements for both the "Principal Display Panel" ("PDP") and the "Food Nutrition Panel" ("FNP")[4]. These requirements are the result of "The Nutrition Labeling and

[4] See 21 C.F.R. 101.1 and 21 C.F.R. 101.9

Education Act (NLEA)".[5] As part of this, the law and implementing regulations both established standardized serving sizes by establishing reference amounts and set forth specific rules for rounding of nutritional values to ensure the reported data is clear to the customer. In the case of Pasta, the reference amount has been set at 2 ounces/56 grams and in the case of protein, the rule is that the number of grams per serving must be rounded to **the nearest whole gram** and that **fractional grams cannot be reported**[6]. There are two distortive roundings which impact the model match – the serving size weight and the grams of protein. This rounding means that it is impossible to classify pasta as type 2 if it has an average protein percentage, from 11.6 to 12.48% as Type 2[7]. 7 grams of protein with a serving size of 56 grams is exactly 12.5%. All such pasta is reported with a protein content of 7 grams per

---

[5] Public Law 101-535, 1990.

[6] The relevant regulation states:
(7) "Protein": **A statement of the number of grams of protein in a serving, expressed to the nearest gram**, except that if a serving contains less than 1 gram, the statement "Contains less than 1 gram" or "less than 1 gram" may be used as an alternative, and if the serving contains less than 0.5 gram, the content may be expressed as zero. * * * Protein content may be calculated on the basis of the factor 6.25 times the nitrogen content of the food as determined by the appropriate method of analysis as given in the "Official Methods of Analysis of the AOAC International," except when official AOAC procedures described in this paragraph (c)(7) require a specific factor other than 6.25, that specific factor shall be used. (21 CFR 101.9(c)(7) (Emphasis Added).

[7] To phrase it another way, under the FDA labeling rules, Pasta with a 12% protein content would contain 6.72 grams of protein. Under FDA rules, such value would necessarily be rounded up to 7 grams for reporting on the label and the result would be a reported 12.5% protein level.

each 56-gram serving which the Department has interpreted as 12.5% and as Type 1. In other words, by not taking into account the FDA rounding rules, the Department has effectively moved the dividing line for standard and premium pasta from 12.5% protein to 11.6% protein.

This is illustrated by the following table:

| | | | | | |
|---|---|---|---|---|---|
| Serving Size | 56 g | 56 g | 56g | 56g | 56g |
| Actual Grams | 6.51 | 6.99 | 7.49 | 7.51 | 7.99 |
| Actual Percentage | 11.63% | 12.48% | 13.37% | 13.41% | 14.27% |
| Reported as grams | 7 | 7 | 7 | 8 | 8 |
| Reported Percentage | 12.50% | 12.50% | 12.5% | 14.3% | 14.3% |
| Actual Protein Code | 2 | 2 | 1 | 1 | 1 |
| Department Protein Code | 1 | 1 | 1 | 1 | 1 |

This rounding error in grams of protein is further magnified by the fact that the "serving size" on the package is also not an accurate number. One pound contains 453.592 grams. Divided into 8 equal servings, this is a value of 56.74 grams per serving. The FDA rounded this down to 56 grams. Using 56.74 grams (or a rounded up 57 grams) also changes the results as illustrated as follows:

| | | | | |
|---|---|---|---|---|
| Serving Size | 56.74 g | 56.74 g | 56.74g | 56.74g |
| Actual Grams | 6.51 | 6.99 | 7.51 | 7.99 |
| Actual Percentage | 11.47% | 12.32% | 13.24% | 14.08% |
| Reported as grams | 7 | 7 | 8 | 8 |
| Reported Percentage Using Reported Protein | 12.34% | 12.34% | 14.10% | 14.10% |
| Actual Protein Code | 2 | 2 | 1 | 1 |
| Department Protein Code | 1 | 1 | 1 | 1 |

It is thus clear that the use of the FDA nutrition facts standards because of

rounding is neither transparent nor consistent and produces results which mask the true protein content and which, without adjustment, produces inaccurate and unreliable results that do not reflect the actual protein content.

In contrast, the nutrition information on Italian products reflect a serving size of 100 grams. Thus, in the case of the Italian product, the rounding rules do not create the same discrepancy. The serving size of 100 grams is not rounded. The net result of this is that a significant band of identical product in the U.S. would not be compared to a significant band of identical product sold in Italy. For example, a product with an actual protein content of 12.2% would be classified as "premium" pasta based on the U.S. nutrition label and would be "standard" pasta based on the Italian nutrition label.

Commerce must make its decision based on a fair and balanced comparison of the data. A comparison which is not fair or balanced is inherently arbitrary and capricious. To do otherwise is arbitrary and capricious. *See Atlantic Sugar, Ltd. v. United States*, 744 F.2d at 1562 ("substantial evidence" must be measured by the record as a whole, "including whatever fairly detracts from the substantiality of the evidence.") *See also, Jinan Yipin Corp. v. United States*, 637 F. Supp. 2d 1183, 1192 (Ct. Int'l Trade 2009).

B. Commerce Cannot Refuse to Adjust The Protein Content For Scalar Differences And Such Refusal Is Not Supported By Substantial Evidence.

In the issues and decisions memorandum, the Department stated in relevant part:

> Commerce has considered and rejected the claims regarding rounding and nitrogen conversion factors in prior reviews and in doing so has repeatedly emphasized the importance of transparency and consistency. We do the same here. Given that the protein content physical characteristic was created, in part, based on the finding that "there is not a clearly defined method of identifying premium pasta other than the protein content marked on the packages," **we find that relying on values not shown on the packaging label for this physical characteristic would detract from the consistency and transparency of defining each product** (i.e., CONNUM), which in turn implicates the accuracy of the product comparisons (i.e., the identification of identical or similar merchandise sold in the Italian market based on whether the pasta sold in each market is premium or not).

The Department's statement displays a fundamental misunderstanding as the operation of "scales" and "measures" and the concerns expressed by appellants. As discussed below, adjusting protein values to the same scale **is not**, in fact, relying on values not shown on the packaging label, but rather is simply converting such values on the package to a uniform measure. Scalar conversions are based on a fixed formula and the relationship between items on different scales is based on science and math. 0° Celsius is 32° Fahrenheit and 273° Kelvin. The "value" – i.e. the

physical properties have not changed. In other words, even with the conversion to a uniform scale, the reported value is still the value reported on the label.

This is, ultimately, a very simple issue as to comparing products after converting the values using the same scale. U.S. FDA rules[8] calculate protein content by multiplying the nitrogen units by 6.25 while the Italian standard calculates protein content by multiplying the same nitrogen units by 5.7. Thus, a product with 1.2 nitrogen units, would be found to have "7.5" grams of Protein using the U.S. standard and "6.84" grams of protein using the EU standard. (APPX002219 – 002226)

We submit that an accurate comparison is between the actual **physical** properties of the products, and not simply comparing numbers generated on two different measuring scales without adjusting for the scale. We submit that in comparing two or more products, the same measuring scale must be used. In this case, the common factor with respect to protein is, ultimately, the **nitrogen content**. This is a fixed physical property. It is readily identifiable, and these physical properties can be readily ascertained and compared. The Department must adjust the calculation of the CONNUM to ensure that comparisons are made using the same scale.

This is not a difficult concept. The conversion factors from nitrogen content

[8] 21 CFR 101.9(c)(7)

to grams of protein are long established by science. Such conversions are similar to other conversions of information to the same scale for weights and measures and temperature. For example, simply reporting that substance A has a temperature of 32 degrees and substance B has a temperature of 32 degrees does not establish a meaningful comparison. It does not mean that these two substances have the same physical temperature. 32 degrees using the Fahrenheit scale is freezing. 32 degrees using the Celsius scale is nearly 90 degrees Fahrenheit, the temperature of a summer day in New York City.

The Department also converts, or requires parties to convert, weights from the Metric system to the Avoirdupois (English) system and vice versa. (See Initial Questionnaire at page G-4). (APPX001225) There is no rational reason for the Department to refuse to convert the protein content by applying a similar constant.

As noted by the Federal Circuit in *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333 (Fed. Cir. 2016) "Our case law and the statute thus teach that a Commerce determination (1) is "accurate" if it is correct as a **mathematical and factual matter** . . ." *Nan Ya* at 1344 (Emphasis Added). In this case, refusing to convert the protein to the same scale means that the protein content used in the analysis is not correct as a mathematical and factual matter, but rather is necessarily not correct as a mathematical and factual matter and is thus inaccurate.

Accordingly, the Department's refusal to take into account these scalar

differences and rely upon unadjusted numbers of different scales is simply not correct. The Department's model match methodology cannot ignore basic laws of physics. In this case, the common factor with respect to protein is, ultimately, the nitrogen content. To the extent that the Department continues to set a standard for protein based on the percentage of protein, it must first adjust the reported grams of protein to a common scale just as the Department requires the adjustment of weight to a single scale – whether the avoirdupois system (pounds/ounces) or the metric system (kilograms/grams). Absent such adjustment, the absurd circumstance will exist where identical product will be treated differently purely because of scalar differences. Such conversion would retain the use of the values on the Nutrition Fact Panel of the label, the stated goal of the Department, and would be no less transparent or consistent and would at the same time be more accurate.

This Court has an obligation to determine whether Commerce's conclusion is based on substantial evidence. Since there is no evidence at all supporting Commerce's position that protein is calculated using the same standards there is overwhelming evidence that the decision not to adjust protein content to the same scale was not reasonable, plaintiffs ask this Court to find Commerce's decision unsupported by substantial evidence.

### C. Commerce's Protein Coding Causes Physically Dissimilar Products in The Two Markets to Be Treated as Identical, And Causes Physically Identical Products to Be Treated as Dissimilar

The law requires Commerce to base its comparisons among prices and costs on the *physical characteristics* of the goods. Here, Commerce's protein coding practice causes dissimilar goods to be treated as identical and causes identical goods to be treated as dissimilar in the respective markets.

The statute provides:

> The term "foreign like product" means merchandise in the first of the following categories in respect of which a determination for the purposes of subtitle B of this title can be satisfactorily made:
>
> (A) The subject merchandise and other merchandise, which is identical in *physical characteristics* with, and was produced in the same country by the same person as, that merchandise.

19 U.S.C. §1677(16)(A) (emphasis added). Thus, the statute speaks in terms of "physical characteristics" of the goods under consideration, not linguistic descriptions.

In the AR-15 ID Memo, where the current practice of reporting PROTEIN strictly per the label on the goods was first implemented, Commerce explains that reporting per the label is intended to ensure that goods that are *physically identical* will have the same protein code:

> {Respondent} Rummo argues that, pursuant to the statute, 19 U.S.C. §1677(16)(A), the Department is required to consider physical characteristics in determining which comparison market sales to match to U.S. sales and asserts that a packaging label is not a physical characteristic of the pasta. Rummo's argument is misplaced. The Department did not say that a label is itself a physical characteristic; rather *the Department relies on the protein content information reported on the label to identify the physical characteristic of protein.*

*Pasta From Italy: Final Results of 15th Antidumping Duty Administrative Review, Final No Shipment Determination and Revocation of Order, in Part; 2010–2011*, 78 Fed. Reg. 9,364 (Dep't Commerce Feb. 8, 2013), ID Memo at comment 4 (emphasis added) ("*AR-15F IDM*"). The Department practice, however, does not ensure that goods are physically identical will have the same protein code.

The statement of protein content on the label is not an end in itself; it is a proxy for the physical characteristic of protein in the pasta.

In both the United States and Italy, the protein content of foods, including pasta, is calculated according to the observed amount of nitrogen in the article. This is not a new process and is based on the laboratory discoveries of Danish chemist Johan Kjeldahl in 1883. (APPX002144, APPX002200) As noted above, in the United States, the protein content is measured as N (the nitrogen content) times 6.25, while in Italy, the protein content is measured as N times 5.7 (*id.*):

$Protein_{Italy} = N * 5.7$

$Protein_{USA} = N * 6.25$

Thus, pasta with a nitrogen content of 1.2 per 56 grams would have a protein content of 6.84 (1.2 * 5.7 = 6.84) grams under the Italian protocol and of 7.5 (1.2* 6.25 = 7.5) grams under the U.S. protocol. Applying this to the 56-gram serving size produces a percentage of 12.21% ( 6.84/56 = .1221) under the Italian protocol and a percentage of 13.39% (7.5/56 = .1339) under the U.S. protocol. The identical merchandise would thus have different protein content and different classifications based on the ingredient panels in the two markets. The U.S. pasta would be "premium pasta" unlike the Italian pasta would be "standard" pasta. The net impact of this is the comparison of standard, and lower priced, U.S. pasta with premium, and higher priced, pasta.

These respective protein measurements are used to report the protein content on the nutrition panel which the law requires on foodstuffs sold at retail. Consequently, these measurement protocols underlie the protein coding of the antidumping questionnaire, since the questionnaire requires reporting "as stated on the label of the respective product," *supra*.

The difference in measurement protocols causes goods with the same *physical* protein content to be reported with *different* protein coding in the U.S. and HM sales databases. This results in comparisons between databases in which identical products are treated as dissimilar and dissimilar products are treated as identical. Such differences result in a comparison which is neither transparent nor consistent.

Commerce has long been aware of this disparity in protein measurements between markets but has consistently chosen to ignore it. In AR-14 − two periods of review after Commerce first implemented the PROTEIN reporting field − respondent Tomasello provided a detailed explanation of the disparity in protein measurement protocols between the U.S. and Italian markets, supported by a 10-page exhibit containing technical information about the Kjeldahl measurement process and the difference in protocols between the two markets. Market Report Exh. D. (APPX002202 – 002226). In AR-15 − the very same review in which Commerce decided that protein content must be reported in accordance with the information on the nutrition panel of the retail package − respondent Granoro provided detailed comments explaining why this methodology would result in the treatment of identical goods as dissimilar. Market Report Exh. E. (APPX002231 – 002232.) Granoro provided those comments in response to Commerce's requests for comments on precisely this issue in AR-15. Notably, in neither of the IDMs of the two reviews did Commerce make any mention of this issue, nor was this issue taken to the Court.

Thus, for nearly a decade, Commerce has been apprised of the inconsistency arising from its protein coding practice, but it has nevertheless continued to ignore the issue whenever possible and to reject any change − on the ironic ground of the need for consistency − when ignoring the issue was impossible. *See*, *Final Results*

*of the 22nd Administrative Review of the Antidumping Duty Order on Pasta from Italy; 2017-2018,* 85 Fed. Reg. 2714 (Dep't Commerce Jan. 16, 2020), *sub judice*, *Zara S.p.A. et al. v. United States,* C.I.T. Consol. Ct. No. 20-00023, IDM at comment 1.

In *Fagersta Stainless AB v. United States*, 577 F. Supp. 2d 1270, 1275 (Ct. Int'l Trade 2008), the Court upheld Commerce's practice "not to modify {a given model-match} methodology in subsequent reviews unless there are 'compelling reasons' to do so." Among those compelling reasons is "greater accuracy in comparing foreign like product to the single most similar U.S. model, in accordance with {19 U.S.C. §1677(16)(B)}…" 577 F. Supp. 2d at 1277. A further compelling reason is "that the existing model-match criteria 'are not reflective of the merchandise in question…'" *Id.*

In the IDM under appeal, Commerce decided against changing its protein coding on the following rationale (IDM at 10, footnotes omitted):

> Commerce has considered and rejected the claims regarding … nitrogen conversion factors in prior reviews and in doing so has repeatedly emphasized the importance of transparency and consistency. We do the same here. Given that the protein content physical characteristic was created, in part, based on the finding that "there is not a clearly defined method of identifying premium pasta other than the protein content marked on the packages," we find that relying on values not shown on the packaging label for this physical characteristic would detract from the consistency and transparency of

> defining each product (i.e., CONNUM), which in turn implicates the accuracy of the product comparisons (i.e., the identification of identical or similar merchandise sold in the Italian market based on whether the pasta sold in each market is premium or not).

Thus, it is Commerce's position that "transparency and consistency" are more important than accuracy. This, however, cannot possibly be a correct statement of the law; in *Fagersta*, the Court explained that the coding of physical characteristics must "be reflective of the merchandise in question." Moreover, a "compelling reason" to change the model-matching reporting is presented when a change would result in a "greater accuracy in comparing foreign like product to the single most similar U.S. model, in accordance with {19 U.S.C. §1677(16)(B)}…"

In this appeal, we must take Commerce at its word: the agency's decision to rely on the figure on the ingredient panel is made for reasons of "transparency and consistency." Commerce has proffered no other rationale. But this rationale is inconsistent with the requirement of 19 U.S.C. 19 U.S.C. §1677(16)(A) that product comparisons reflect the "physical characteristics" of the goods, and it is likewise inconsistent with *Fagersta*, according to which compelling reasons to change a coding field for physical characteristics include "greater accuracy" and consistency between the coding and the physical attributes of the goods in question. It also ignores that any "differences" could be adjusted by applying an established, fixed factor based on science. As we summarized above, identity between labels is not

the goal of the coding; the identity between labels is intended to reflect an identity between the physical content of the packages. Because the labels have different meanings in the two markets, the labels are not an apt proxy for the product.

As the Federal Circuit has explained, "while various methodologies are permitted by the statute, it is possible for the application of a particular methodology to be unreasonable in a given case when a more accurate methodology is available…." *Thai Pineapple, supra*, 273 F.3d 285. This is precisely the case here. As in *Thai Pineapple*, it is the role of the Court to determine whether Commerce's "application of a particular methodology" is reasonable. Here, it is plainly unreasonable for Commerce to rely on "transparency and consistency" as justifying a methodology that results in the treatment of physically identical goods as dissimilar and dissimilar goods as if they were identical. This is particularly the case here where the adjustment can be done by applying a known constant derived by science. Commerce's methodology is arbitrary and capricious and cannot stand.

Plaintiffs therefore ask this Court to find that Commerce's instruction for protein coding is unlawful insofar as it results in physically identical goods being reported as dissimilar and in dissimilar goods being reported as identical, in violation of the statute and precedent.

D) Commerce's Treatment of the Protein Coding is Unsupported by Substantial Evidence

1. Contrary To Commerce's Position, Pasta with A Protein Content Of 12.5% Is Standard Pasta in Both the United States and Italy

Historically, Commerce implemented the 12.5% protein breakpoint for pasta based *solely* on the practice of the Italian commodity exchanges with regard to classification of standard **semolina** *versus* premium **semolina**. *See*, AR-12 Final IDM, discussed *supra*. Thus, Commerce's protein coding was done entirely without reference to practices in the production, distribution, or sale of the finished product under review, namely, pasta. The applicability of the semolina protein breakpoint to the finished product, pasta, is particularly questionable because the production of pasta always involves the blending of more than one semolina. *Id*. at comment 1 ("The different types of semolina are generally kept in separate storage facilities. For each batch of pasta being produced, the companies select which type of semolina to use, which regularly included blending more than one type of semolina, based on the recipe for the finished pasta.').

In light of the complete absence of any evidence in any administrative review, including AR-12, concerning the significance of pasta protein in the marketplace, the designer of the Market Report chose to tabulate representative purchases of pasta in the retail marketplace to ascertain the breakpoint between standard and premium

pasta in terms of protein content, and to compare protein content against price in the marketplace. (APPX002362-002363 and APPX002385-002386.)

The Market Report demonstrates that pasta with a protein content, per the label, of 12.5%, is standard pasta.

In the Market Report, the researcher bought pasta from four supermarkets in the Washington, DC suburban area, namely, Giant, Safeway, Harris Teeter, and Balducci's. The first three supermarkets are ordinary retail chains, while Balducci's supermarket is a high-end retailer focused on the upscale market. (APPX002385-002386)

At each store, the researcher purchased a short cut and a long cut of each available brand. Within the short cuts, the researcher purchased a normal short cut and a specialty short cut (e.g., farfalle), as defined by Commerce's SHAPE codes. Here is a summary of those purchases:

| Store | Brand | LONG/SHORT | Shape |
|---|---|---|---|
| **GIANT** | **(GIANT)** | LONG | SPAGHETTI |
| | | SHORT | FARFALLE |
| | | | SHELLS |
| | **BARILLA** | LONG | FETTUCCINE |
| | | | SPAGHETTI |
| | | SHORT | FARFALLE |
| | | | RIGATONI |
| | **DE CECCO** | LONG | SPAGHETTI |
| | | SHORT | FUSILLI |
| | **SAN GIORGIO** | LONG | SPAGHETTI |
| | | SHORT | CAVATAPPI |
| | | | ZITI |
| **SAFEWAY** | **BARILLA** | LONG | SPAGHETTI |
| | | SHORT | FARFALLE |
| | | | ROTINI |
| | **DE CECCO** | LONG | SPAGHETTI |
| | | SHORT | CAVATAPPI |
| | **SAN GIORGIO** | LONG | SPAGHETTI |
| | | SHORT | FARFALLE |
| | | | ROTINI |
| | **SIGNATURE (SAFEWAY BRAND)** | LONG | SPAGHETTI |
| | | SHORT | FARFALLE |
| | | | ROTINI |
| **HARRIS TEETER** | **BARILLA** | LONG | LINGUINE |
| | | SHORT | PENNE |
| | | | ROTINI |
| | **COLAVITA** | LONG | SPAGHETTI |
| | | SHORT | FUSILLI |
| | | | PENNE |
| | **DE CECCO** | LONG | LINGUINE |
| | | SHORT | PENNE RIG. |
| | **HARRIS TEETER** | LONG | SPAGHETTI |
| | | SHORT | BOWTIES |
| | | | ROTINI |
| | **MUELLER'S** | LONG | SPAGHETTI |
| | | SHORT | BOWTIES |

| Store | Brand | LONG/SHORT | Shape |
|---|---|---|---|
| | | | PENNE |
| | **PRIVATE SEL (H/T PRIV LAB)** | LONG | SPAGHETTI |
| | | SHORT | FARFALLE |
| | | | ZITI |
| **BALDUCCI'S** | **BARILLA** | SHORT | ZITI |
| | **CELLINO** | SHORT | PENNE |
| | **DE CECCO** | SHORT | FUSILLI |
| | **DI MARTINO** | LONG | LINGUINE |
| | | SHORT | FARFALLE |
| | | | PACCHERI |
| | **LA MOLISANA** | SHORT | RIGATONI |
| | **RUSTICHELLA** | LONG | LINGUINE |
| | | SHORT | PENNE |

The researcher tabulated the protein content of each purchase according to the label, and the price of each purchase. Exhibits N−Q of the Market Report contain photographs of the packages, the nutrition panels,[9] and the register tapes of each transaction. (APPX002387-002480).

As a result of the FDA rounding rules and the use of the 6.25 nitrogen units per gram, there was not a single pasta in any of the stores with a protein content of less than 12.5%. See Market Report Exh. M at 2, showing:

[9] Under U.S. labeling rules, the protein content is given in grams per serving. The serving size for this measurement is 56 grams. If the protein content is 7 grams, this is equivalent to 12.5% (7/56=12.5%). As discussed herein this is an artificial number based, in part, on FDA rounding rules.

| | A | B | C | D | E | F | G | H | I | J |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | |
| 2 | | | | | | | | | | |
| 3 | ID | Store | Brand | Shape | LONG/SHORT | Weight/pack (OZ) | Protein, grams per serving | Protein % | Price, USD/LB | Price, USD/pkg |
| 4 | 01 | GIANT | SAN GIORGIO | CAVATAPPI | SHORT | 16 | 7 | 0.125 | 1.49 | 1.49 |
| 5 | 02 | GIANT | SAN GIORGIO | ZITI | SHORT | 16 | 7 | 0.125 | 1.49 | 1.49 |
| 6 | 03 | GIANT | (GIANT) | FARFALLE | SHORT | 12 | 7 | 0.125 | 1.32 | 0.99 |
| 7 | 04 | GIANT | (GIANT) | SHELLS | SHORT | 16 | 7 | 0.125 | 0.99 | 0.99 |
| 8 | 05 | GIANT | BARILLA | FARFALLE | SHORT | 16 | 7 | 0.125 | 1.59 | 1.59 |
| 9 | 06 | GIANT | BARILLA | RIGATONI | SHORT | 16 | 7 | 0.125 | 1.59 | 1.59 |
| 10 | 07 | GIANT | DE CECCCO | FUSILLI | SHORT | 16 | 8 | 0.143 | 1.99 | 1.99 |
| 11 | 08 | GIANT | DE CECCCO | SPAGHETTI | LONG | 16 | 8 | 0.143 | 1.99 | 1.99 |
| 12 | 09 | GIANT | BARILLA | FETTUCCINE | LONG | 16 | 7 | 0.125 | 1.59 | 1.59 |
| 13 | 10 | GIANT | BARILLA | SPAGHETTI | LONG | 16 | 7 | 0.125 | 1.59 | 1.59 |
| 14 | 11 | GIANT | (GIANT) | SPAGHETTI | LONG | 16 | 7 | 0.125 | 0.99 | 0.99 |
| 15 | 12 | GIANT | SAN GIORGIO | SPAGHETTI | LONG | 16 | 7 | 0.125 | 1.49 | 1.49 |
| 16 | 13 | SAFEWAY | BARILLA | ROTINI | SHORT | 16 | 7 | 0.125 | 1.99 | 1.99 |
| 17 | 14 | SAFEWAY | SIGNATURE (SAFEWAY BRND) | FARFALLE | SHORT | 12 | 7 | 0.125 | 1.72 | 1.29 |
| 18 | 15 | SAFEWAY | SIGNATURE (SAFEWAY BRND) | ROTINI | SHORT | 16 | 7 | 0.125 | 1.29 | 1.29 |
| 19 | 16 | SAFEWAY | BARILLA | FARFALLE | SHORT | 16 | 7 | 0.125 | 1.99 | 1.99 |
| 20 | 17 | SAFEWAY | DE CECCCO | CAVATAPPI | SHORT | 16 | 8 | 0.143 | 2.99 | 2.99 |
| 21 | 18 | SAFEWAY | SAN GIORGIO | FARFALLE | SHORT | 12 | 7 | 0.125 | 2.39 | 1.79 |
| 22 | 19 | SAFEWAY | SAN GIORGIO | ROTINI | SHORT | 16 | 7 | 0.125 | 1.79 | 1.79 |
| 23 | 20 | SAFEWAY | SAN GIORGIO | SPAGHETTI | LONG | 16 | 7 | 0.125 | 1.79 | 1.79 |
| 24 | 21 | SAFEWAY | DE CECCCO | SPAGHETTI | LONG | 16 | 8 | 0.143 | 2.99 | 2.99 |
| 25 | 22 | SAFEWAY | BARILLA | SPAGHETTI | LONG | 16 | 7 | 0.125 | 1.99 | 1.99 |
| 26 | 23 | SAFEWAY | SIGNATURE (SAFEWAY BRND) | SPAGHETTI | LONG | 16 | 7 | 0.125 | 1.29 | 1.29 |
| 27 | 24 | HARRIS TEETER | MUELLER'S | PENNE | SHORT | 16 | 7 | 0.125 | 1.69 | 1.69 |
| 28 | 25 | HARRIS TEETER | MUELLER'S | BOWTIES | SHORT | 12 | 7 | 0.125 | 2.25 | 1.69 |
| 29 | 26 | HARRIS TEETER | DE CECCCO | PENNE RIG. | SHORT | 16 | 8 | 0.143 | 3.19 | 3.19 |
| 30 | 27 | HARRIS TEETER | BARILLA | PENNE | SHORT | 16 | 7 | 0.125 | 1.89 | 1.89 |
| 31 | 28 | HARRIS TEETER | HARRIS TEETER | BOWTIES | SHORT | 12 | 7 | 0.125 | 1.32 | 0.99 |
| 32 | 29 | HARRIS TEETER | HARRIS TEETER | ROTINI | SHORT | 16 | 7 | 0.125 | 0.99 | 0.99 |
| 33 | 30 | HARRIS TEETER | BARILLA | ROTINI | SHORT | 16 | 7 | 0.125 | 1.89 | 1.89 |
| 34 | 31 | HARRIS TEETER | PRIVATE SEL (H/T PRIV LAB) | ZITI | SHORT | 16 | 7 | 0.125 | 1.79 | 1.79 |
| 35 | 32 | HARRIS TEETER | PRIVATE SEL (H/T PRIV LAB) | FARFALLE | SHORT | 16 | 7 | 0.125 | 1.79 | 1.79 |
| 36 | 33 | HARRIS TEETER | COLAVITA | PENNE | SHORT | 16 | 8 | 0.143 | 2.49 | 2.49 |
| 37 | 34 | HARRIS TEETER | COLAVITA | FUSILLI | SHORT | 16 | 8 | 0.143 | 2.49 | 2.49 |
| 38 | 35 | HARRIS TEETER | BARILLA | LINGUINE | LONG | 16 | 7 | 0.125 | 1.89 | 1.89 |
| 39 | 36 | HARRIS TEETER | DE CECCCO | LINGUINE | LONG | 16 | 8 | 0.143 | 3.19 | 3.19 |
| 40 | 37 | HARRIS TEETER | MUELLER'S | SPAGHETTI | LONG | 16 | 7 | 0.125 | 1.69 | 1.69 |
| 41 | 38 | HARRIS TEETER | HARRIS TEETER | SPAGHETTI | LONG | 16 | 7 | 0.125 | 0.99 | 0.99 |
| 42 | 39 | HARRIS TEETER | COLAVITA | SPAGHETTI | LONG | 16 | 8 | 0.143 | 2.49 | 2.49 |
| 43 | 40 | HARRIS TEETER | PRIVATE SEL (H/T PRIV LAB) | SPAGHETTI | LONG | 16 | 7 | 0.125 | 1.79 | 1.79 |
| 44 | 41 | BALDUCCI'S | CELLINO | PENNE | SHORT | 16 | 7.6 | 0.136 | 2.49 | 2.49 |
| 45 | 42 | BALDUCCI'S | RUSTICHELLA | PENNE | SHORT | 17.64 | 7.56 | 0.135 | 5.44 | 5.99 |
| 46 | 43 | BALDUCCI'S | DI MARTINO | FARFALLE | SHORT | 16 | 8 | 0.143 | 3.29 | 3.29 |
| 47 | 44 | BALDUCCI'S | DI MARTINO | LINGUINE | LONG | 16 | 8 | 0.143 | 3.29 | 3.29 |
| 48 | 45 | BALDUCCI'S | RUSTICHELLA | LINGUINE | LONG | 17.64 | 7.56 | 0.135 | 5.44 | 5.99 |
| 49 | 46 | BALDUCCI'S | DI MARTINO | PACCHERI | SHORT | 17.6 | 8 | 0.143 | 3.29 | 3.29 |
| 50 | 47 | BALDUCCI'S | LA MOLISANA | RIGATONI | SHORT | 16 | 8 | 0.143 | 2.49 | 2.49 |
| 51 | 48 | BALDUCCI'S | BARILLA | ZITI | SHORT | 16 | 7 | 0.125 | 1.99 | 1.99 |
| 52 | 49 | BALDUCCI'S | DE CECCCO | FUSILLI | SHORT | 16 | 8 | 0.143 | 2.99 | 2.99 |

(APPX002386)

Furthermore, there was a clear relationship between protein content and price, *id.* at 1:




(APPX002385)

The figure shows that all of the pasta with 12.5% protein sold at under $2.40/lb, with the preponderance at less than $2.00/lb, while the higher-protein pasta, at 14.25%, sold predominantly *above* $2.40/lb. There is an undeniable breakpoint between the 12.5% pasta and the greater-than-12.5% pasta. And there is no pasta with protein content under 12.5%. In fact, as discussed below, because of the rounding rules, any pasta with a protein content of more than 11.6% would round to 12.5%.

Thus, the Market Report shows that, in the four DC-area supermarkets, pasta with a protein content of 12.5% is standard pasta and indeed, 12.5% is the minimum protein content for retail pasta.

The petitioners had ample opportunity to provide a rebuttal factual submission. If the petitioners had reason to believe that the DC-area supermarkets were not representative of the United States as a whole, they were welcome to provide such a rebuttal submission. If they had reason to believe that the protein content of 12.5% does not reflect standard pasta in the United States, they were welcome to provide supporting documentation. If they had any methodological concerns regarding the researcher's approach, they were welcome to provide those concerns in comments for the record. Petitioners provided no such material. *See generally*, Petitioners' letter of December 20, 2020 (APPX002563-002572). Petitioners' failure to provide any rebuttal factual information or comments affirms the reliability and accuracy of the Market Report.

The issue was fully briefed at the administrative level by the parties. Valdigrano explained in detail the methods and conclusions of the Market Report (APPX007900-007918) while La Molisana presented its parallel argument concerning the protein field. (APPX7931-7973). In their rebuttal brief, the petitioners did not question the accuracy or substance of the Market Report, but,

rather, urged Commerce to retain its protein coding on grounds of "transparency" and "consistency." (APPX007979-008112).

In its final IDM, Commerce explained (at 11-12, footnotes omitted):

> The U.S. section of the Market Report consists of labels and receipts for pasta purchased from Washington DC metro area supermarkets along with charts illustrating the relationship between protein content and price. Valdigrano asserts that these data show 12.5 percent protein content is a floor for pasta sold in the U.S. market, and that the true breakpoint between standard and premium pasta is 13.5 percent protein content. We do not find this evidence sufficient to change our existing coding for protein content. The Market Report data cited to in the case brief consist of pasta purchases from four supermarkets in a small geographic region of the United States. No attempt is made in the Market Report to address the potential for manipulation in choice of purchases or to support a claim that these purchases are reflective of the entire U.S. market for pasta products. As such, we do not find these data to be a "compelling reason" to change the instructions for reporting protein content.

Commerce's reasons for declining to implement the consequences of the Market Report constitute an arbitrary and capricious refusal to acknowledge undisputed facts of record and critically the absence of any facts to the contrary. Critically, there were no facts or argument to the contrary.

In *Pesquera Mares Australes Ltda. v. United States,* 266 F.3d 1372, 1379 (Fed. Cir. 2001), the Court held that "merchandise should be considered to be

identical despite the existence of minor differences in physical characteristics, if those minor differences are not commercially significant." Thus, "commercial significance" is the principal criterion by which to decide whether differences between products are "minor." The Market Report makes it clear that the protein content of pasta is commercially significant, and that there is a clear pricing breakpoint between pasta with a protein content of 12.5% and pasta with a protein content above 12.5%.

In *Fagersta Stainless AB v. United States*, 577 F. Supp. 2d 1270, 1275 (Ct. Int'l Trade 2008), the Court upheld Commerce's practice "not to modify {a given model-match} methodology in subsequent reviews unless there are 'compelling reasons' to do so." Among those compelling reasons is "greater accuracy in comparing foreign like product to the single most similar U.S. model, in accordance with {19 U.S.C. §1677(16)(B)}…" 577 F. Supp. 2d at 1277. A further compelling reason is "that the existing model-match criteria 'are not reflective of the merchandise in question…'" *Id.*

Commerce asserts that there are no "compelling reasons" to change the protein coding such that pasta with 12.5% protein is considered standard, rather than premium, pasta, because purchases from only four supermarkets in a single geographic area may not be "reflective of the entire U.S. market" (IDM at 11) and

because the Market Report fails "to address the potential for manipulation in choice of purchases." *Id*. Neither rationale satisfies the applicable criteria.

As for whether the purchases in the Market Report reflect the entire U.S. market, Commerce's suggestion that the DC suburban supermarkets might operate under some schematization of pasta pricing different from other parts of the United States is pure speculation and wholly unsupported by any facts. The petitioners never proposed such a proposition of fact, nor did the petitioners exercise their right to impugn the geographic representativeness of the Market Report by making a similar analysis of other metropolitan markets − New York or Chicago or anywhere else. There was no secret to the methodology of the Market Report: simply send someone to a sample of local supermarket chains, buy one long cut, one short cut and one specialty short cut from each, and tabulate the results. This was surely not beyond the petitioners' capabilities; after all, the petitioners consist of the U.S. industry and, as such, they are selling into every market in the United States.

Commerce must abide by the fact that petitioners did not provide any rebuttal factual information. Commerce's supposition that the Market Report may not be representative of the U.S. market as a whole is unsupported by any evidence whatsoever. Indeed, if Commerce, itself, had any questions about the representativeness of the Report, it could have asked the parties to provide further information, say, relating to other geographic areas. What Commerce cannot

lawfully do is sit back and do nothing, then − in the final results, with no analysis of the issue in the preliminary results, no supplemental questions, and no apparent attention to the issue throughout the review − *ipse dixit* find that the data in the Market Report might not reflect the United States as a whole.

As for whether the author of the Market Report may have manipulated the selection of pasta purchased, Commerce provides no evidence of any such manipulation. In fact, the Report shows that the researcher bought one short cut, one specialty short cut, and one long cut of each brand in each supermarket. Commerce's speculation that there could have been some manipulation in this selection is entirely unfounded. In any event, if the Market Report had relied on a manipulation of selections, petitioners could readily have provided rebuttal factual information to show this to be the case. In the absence of such information, Commerce cannot lawfully claim that the selections of the Report might have been manipulated. Commerce may not rely on speculation when making factual determinations. *See, China National Arts and Crafts Import and Export Corp., Tianjin Branch v. United States,* 771 F. Supp. 407 (Ct. Int'l Trade 1991).

Substantial evidence review requires that the court assess whether the agency action is reasonable given the record as a whole. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006). The record as a whole contains the Market

Report and absolutely no evidence to the contrary. The Final Results fail the *Nippon Steel* test.

Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Commerce cites no evidence whatsoever to support its speculation that the DC suburban supermarkets might not be representative of the U.S. retail environment as a whole vis-à-vis pasta pricing and the undisputed fact that pasta with 12.5% protein is standard pasta, not premium.

In determining whether substantial evidence supports the agency's determination, the court must consider "the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)); *Mitsubishi Materials Corp. v. United States*, 17 C.I.T. 301, 304, 820 F. Supp. 608, 613 (1993). Here, there is no evidence whatsoever that detracts from the substantiality of the evidence in the Market Report.

The Court's function is not to re-weigh the evidence, but to ascertain whether the agency's determination is supported by substantial evidence on the record. *Matsushita Elec. Indus. Corp. v. United States*, 750 F.2d 927, 936 (Fed. Cir. 1984).

Here, it is straightforward for the Court to make this determination. Commerce's does not even pretend to have any authority other than *ipse dixit* to support its assertion that the author of the Market Report may have manipulated the selection of products purchased or that the DC suburbs are somehow discontinuous from the U.S. pasta market as a whole. Commerce's approach compels the conclusion that the Final Results are not supported by substantial evidence on the record and are arbitrary and capricious.

2. Contrary to Commerce's Position, the Minimum Protein Requirement for Premium Semolina is 13.5%

Historically, Commerce set the 12.5% breakpoint for premium pasta based on the breakpoint between standard semolina (with a protein content of less than 12.5%) and premium semolina (with a protein content of 12.5% or higher) utilized by three Italian commodity exchanges at the time of the AR-12 review.

The Market Report provides proof that the current (AR-23) minimum protein content for premium semolina is 13.5%. (APPX002359-002360). Petitioners failed to make any rebuttal submission nor to provide evidence that would impugn the exhibit in the Market Report.

Commerce's conclusion that "the Market Report's citation to a single exchange's breakpoint is not sufficient evidence of an industry-wide change in standards from semolina" (IDM at 12) is unsupported by substantial evidence and

therefore arbitrary and capricious. Commerce cites no evidence in the current record − nor in any other record − to support its speculation that the practice of the Bologna commodity exchange is not representative of the Italian commodity exchanges overall. Petitioners' failure to provide any evidence of such different treatment in different commodity exchanges compels Commerce to accept the finding of the Market Report. There is simply no reason to disbelieve the exhibit in the Market Report, and indeed, Commerce does not dispute its correctness. Nor − contrary to Commerce's speculation − is there any reason to believe that a different standard prevails in any other commodity exchange.

This Court has an obligation to determine whether Commerce's conclusion is based on substantial evidence. *Matsushita, supra.* Since there is no evidence at all supporting Commerce's position that the researcher of the Market Report may have manipulated the selection of items for the study and there is affirmative evidence that the selection was reasonable, plaintiffs ask this Court to find Commerce's decision unsupported by substantial evidence.

## ***CONCLUSION AND CLAIM FOR RELIEF***

In conclusion, the Department's treatment of the protein content portion of the CONNUM is not based on sound facts. The Department's standard is based on out-of-date standard. Furthermore, the Department has failed to convert values to the same scale, but rather compared values using dissimilar scales. Finally, the

Department failed to take into account the impact of rounding on protein content. The net impact of this is the Department's protein content determination must be rejected and the Court should remand this matter for further consideration of these issues.

For the foregoing reasons, Plaintiff-Appellants requests that this Court overturn the decision of the Court of International Trade and direct the lower Court to remand this matter to the Department of Commerce with instructions to reconsider its refusal to adjust the scalar issues.

Respectfully submitted,

/s/David J. Craven
DAVID J. CRAVEN
CRAVEN TRADE LAW LLC
3744 N Ashland
Chicago, IL 60613

(773) 709-8506

Counsel to Plaintiff-Appellants

September 26, 2023

# Addendum

Pursuant to Fed. Cir. Rule 28 (11)

Index to Addendum



| Description | Appendix Citation |
|---|---|
| Judgment Order in *La Molisana, S.p.A. v. United States*, CIT Court No. 21-00291 (April 24, 2023) | APPX000036 |
| *La Molisana, S.p.A. v. United States*, Slip Op 23-59 (Ct. Int'l Trade April 24, 2023) | APPX000037-000050 |

Judgment Order in *La Molisana, S.p.A. v. United States*,
CIT Court No. 21-00291 (April 24, 2023)

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| LA MOLISANA S.P.A.,<br><br>Plaintiff,<br><br>and<br><br>VALDIGRANO DI FLAVIO PAGANI S.R.L.,<br><br>Consolidated Plaintiff ,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | Before: Richard K. Eaton, Judge<br><br>Consol. Court No. 21-00291 |

**JUDGMENT**

This case having been duly submitted for decision; and the court, after due deliberation, having rendered a decision herein; now therefore, in conformity with said decision, it is hereby

**ORDERED, ADJUDGED, and DECREED** that Final Results, ECF No. 18, are sustained.

/s/ Richard K. Eaton
Judge

Dated: April 24, 2023
New York, New York

*La Molisana, S.p.A. v. United States*, Slip Op 23-59
(Ct. Int'l Trade April 24, 2023)

Slip Op. 23-59

UNITED STATES COURT OF INTERNATIONAL TRADE

LA MOLISANA S.P.A.,

Plaintiff,

and

VALDIGRANO DI FLAVIO PAGANI S.R.L.,

Consolidated Plaintiff ,

v.

UNITED STATES,

Defendant.

Before: Richard K. Eaton, Judge

Consol. Court No. 21-00291

**OPINION**

[The final results of the U.S. Department of Commerce's twenty-third administrative review of the antidumping duty order on pasta from Italy are sustained.]

Dated: April 24, 2023

*David L. Simon*, Law Offices of David L. Simon, PLLC, of Washington, D.C., argued for Plaintiff La Molisana S.p.A. and Consolidated Plaintiff Valdigrano di Flavio Pagani S.r.L. On the brief was *David J. Craven*, Craven Trade Law LLC, of Chicago, IL.

*Sosun Bae*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant United States. With her on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Reginald T. Blades, Jr.*, Assistant Director. Of counsel on the brief was *Kirrin A. Hough*, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

Eaton, Judge: This consolidated action involves the final results of the U.S. Department of Commerce's ("Commerce" or the "Department") twenty-third administrative review of the antidumping duty order on certain pasta from Italy ("Order"). *See Certain Pasta From Italy*, 86

Fed. Reg. 28,336 (Dep't Commerce May 26, 2021) ("Final Results") and accompanying Issues and Decision Mem. (May 20, 2021) ("Final IDM"), PR 277; *see also Certain Pasta From Italy*, 61 Fed. Reg. 38,547 (Dep't Commerce July 24, 1996) (Order).

Plaintiff La Molisana S.p.A. ("La Molisana"), a mandatory respondent,[1] and Consolidated Plaintiff Valdigrano di Flavio Pagani S.r.L. ("Valdigrano"), a non-examined respondent, (collectively, "Plaintiffs") are Italian producers and exporters of the subject pasta. By their motion for judgment on the agency record, Plaintiffs challenge Commerce's determination not to adjust its model-match method with respect to coding for the pasta's protein content. *See* Pls.' Mem. Supp. Mot. J. Agency R., ECF No. 27-1 ("Pls.' Br."); *see also* Pls.' Reply Br., ECF No. 34. For Plaintiffs, the existing model-match method must be adjusted because it results in the comparison of Italian pasta products with those produced in the United States that are physically dissimilar in terms of their protein content.

Defendant the United States ("Defendant"), on behalf of Commerce, urges the court to sustain the Final Results. *See* Def.'s Resp. Opp'n at 8, ECF No. 30 ("The evidence and arguments

---

[1] The only other mandatory respondent was a collapsed entity comprised of Ghigi 1870 S.p.A. and Pasta Zara S.p.A. Neither company is a party to this action. "Commerce's practice has devolved to the point where it regularly chooses only two (and sometimes one) mandatory respondents to be 'representative' of unexamined respondents for the purpose of calculating the [separate] rate in a review, a [practice] that this Court has regarded with some skepticism." *Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 45 CIT __, __, 519 F. Supp. 3d 1224, 1236 (2021) (footnote omitted) (first citing *Zhejiang Native Produce & Animal By-Prods. Imp. & Exp. Corp. v. United States*, 33 CIT 1125, 637 F. Supp. 2d 1260 (2009); and then citing *Carpenter Tech. Corp. v. United States*, 33 CIT 1721, 662 F. Supp. 2d 1337 (2009)). "There can be little question that, if Commerce were to change its method and name more than two mandatory respondents, separate rate companies would receive more accurate rates, and a great deal of litigation would be avoided." *Xiping Opeck Food Co. v. United States*, 45 CIT __, __, 551 F. Supp. 3d 1339, 1356-57 (2021). The Federal Circuit has expressed similar concerns. *See, e.g.*, *YC Rubber Co. (N. Am.) LLC v. United States*, No. 21-1489, 2022 WL 3711377, at *3-4 (Fed. Cir. Aug. 29, 2022) (not reported in the Federal Reporter) (holding that "Commerce unlawfully restricted its examination to a single mandatory respondent" under 19 U.S.C. § 1677f-1(c)(2)).

placed on the record by plaintiffs do not sufficiently demonstrate that Commerce's instructions for reporting the protein content of finished pasta, in place for more than a decade, result in price-to-price comparisons between physically dissimilar pasta or fail to reflect market reality such that Commerce must alter them.").

The court has jurisdiction under 28 U.S.C. § 1581(c) (2018) and 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018). For the following reasons, Plaintiffs' motion is denied, and the Final Results are sustained.

## BACKGROUND

In September 2019, Commerce initiated the twenty-third review of the Order, covering the period of review from July 1, 2018, to June 30, 2019. *See Initiation of Antidumping and Countervailing Duty Admin. Revs.*, 84 Fed. Reg. 47,242 (Dep't Commerce Sept. 9, 2019). Commerce selected La Molisana as a mandatory respondent. Valdigrano was not selected for examination but participated in the review by filing an administrative case brief.

The primary controversy in this case involves the method that Commerce requires respondents to use when reporting the protein content of pasta sold in the home market (PROTEINH) and in the United States (PROTEINU). Protein content is one of several physical characteristics of pasta that are used to compose a control number, or CONNUM, for each unique pasta product.[2] CONNUMs are comprised of digits, and each digit is a "code" for a physical

---

[2] The protein content of pasta "is an important determinant of the quality of the product." Pls.' Br. at 3 (citing Pls.' Br. attach. B (Market Report) Ex. H). "The protein content in pasta comes from semolina flour—the main input of pasta—which is made from durum wheat." *Ghigi 1870 S.p.A. v. United States*, 45 CIT __, __, 547 F. Supp. 3d 1332, 1337 n.7 (2021).

characteristic of the product. Commerce uses CONNUMs in its model-match method to identify "like" products to compare.

In November 2019, Commerce issued its initial antidumping questionnaire to La Molisana. *See* Antidumping Questionnaire (Nov. 1, 2019), PR 66. The questionnaire instructions asked the respondent to "[i]dentify the percentage of protein in the pasta sold, as stated on the label of the respective product." *Id.* at B-9 (home market sales), C-7 (U.S. sales). Pasta with a protein content of 12.5% or more was to be coded as "1" (premium), and pasta with a protein content of 10.00-12.49% was to be coded as "2" (standard), based on the protein content listed on the nutrition label of the packaging.[3] The "1" or "2," in turn, would become a digit in the CONNUM for a particular product.

Here, La Molisana complied with Commerce's instructions and coded the protein content of its pasta as "1" or "2," using the percentage of protein stated on the nutrition label. But in its questionnaire response La Molisana also stated that "due to the nature of the nutrition facts panel and other incontrovertible facts, [the reported code] is not necessarily an accurate representation of the Protein Content." La Molisana Sec. B Resp. Ex. B-2 (Jan. 3, 2020), PR 120. In other words, La Molisana complied with Commerce's instructions but also in its narrative response questioned whether Commerce's method of coding protein content (i.e., as premium "1" or standard "2") would lead to comparisons of products that were dissimilar in terms of protein.

[3] Commerce has used the same coding method, i.e., "1" for premium pasta with a minimum protein content of 12.5% and "2" for standard, based on the percentage listed on the nutrition label, since protein content was introduced as a physical characteristic of pasta in the twelfth administrative review. *See* Final IDM at 7; *see also Certain Pasta from Italy*, 75 Fed. Reg. 6,352, 6,353 (Dep't Commerce Feb. 9, 2010) (final results of twelfth administrative review). To determine the 12.5% breakpoint, Commerce "relied on the breakpoints of *three* separate Italian commodity exchanges." Final IDM at 12 (emphasis in original).

After the preliminary results were published, in which Commerce applied its usual model-match method, Valdigrano and La Molisana filed administrative case briefs. In their respective briefs, each pressed its arguments for why the model-match method, with respect to coding for protein content, must be adjusted to ensure that Commerce compared physically similar pasta products: premium with premium and standard with standard.

Specifically, Valdigrano argued that the 12.5% breakpoint between standard and premium pasta does not reflect current market reality. The company relied on a report that presented price and protein content information for a sample of pasta products sold in the Italian and U.S. markets ("Market Report"). *See* Valdigrano Case Br. (Jan. 26, 2021), PR 257; *see also* Pls.' Br. attach. B (Market Report). The Market Report was prepared by Plaintiffs' counsel based on pasta purchased in one food retail chain in Italy and four food retailers in a suburb of Washington, D.C. Also, part of the information in the report was a screenshot of a website that, for Plaintiffs, demonstrated that a grain exchange in Bologna, Italy "has updated the breakpoint between standard and premium semolina, which now occurs at 13.5% protein content." Market Report at 7 (citing Ex. K). The report concluded that pasta with 12.5% protein content is standard, not premium pasta. *Id.* at 4.

For its part, La Molisana argued that using the nutrition label as the basis to report protein content leads to comparisons of physically dissimilar products because of differences in protein measurement standards in Italy and the United States. Specifically, La Molisana pointed out the countries' different "nitrogen-to-protein" conversion numbers[4] and the rounding requirement

---

[4] Under U.S. Food and Drug Administration regulations, protein content is calculated by multiplying the nitrogen content of the finished product by 6.25. *See* Market Report at 5 (citing Ex. B). Under the Italian standard, protein content is calculated by multiplying the nitrogen content by 5.7. *Id.* at 6 (citing Ex. F). For Plaintiffs, the difference in these multipliers obscures the "real" protein content of products in the U.S. and Italian markets. *See* Pls.' Br. at 35-36 (setting out mathematical calculations of protein content under different nitrogen conversion factors).

under U.S. Food and Drug Administration ("FDA") rules,[5] for which there is no equivalent in Italy. *See* La Molisana Case Br. (Jan. 26, 2021), PR 259.

In the Final Results, Commerce declined to adjust its model-match method with respect to coding for protein and continued to apply its usual method to identify like products, including classifying pasta with a protein content of 12.5% or more as premium pasta, and 10.00-12.49% as standard pasta. Final IDM at 6-12. Ultimately, Commerce determined a weighted average dumping margin for La Molisana of 15.72% and applied the same margin to Valdigrano, as the all-others rate. *See* Final Results, 86 Fed. Reg. at 28,337. Plaintiffs timely commenced this action to bring their objections before the court. Plaintiffs ask the court to remand this matter to Commerce with instructions to adjust its model-match method for coding protein content and revise La Molisana's and Valdigrano's rates accordingly.

## STANDARD OF REVIEW

Commerce's Final Results will be sustained unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## LEGAL FRAMEWORK

In an antidumping case, Commerce compares the price at which subject merchandise is sold in the United States with normal value. *See* 19 U.S.C. § 1677b(a). Normal value is "the price

---

[5] Under FDA food labeling regulations, protein content must be rounded to the nearest gram. *See* 21 C.F.R. § 101.9(c)(7) (2019). Under these rules, Plaintiffs argue, the percentage of protein reported on the nutrition label of a product sold in the United States could be artificially inflated or reduced. For instance, without rounding, pasta with 6.51 grams of protein (or 11.63%) would be considered standard, but with rounding, that same pasta has 7 grams of protein (or 12.5%) and must be coded as premium. *See* Pls.' Br. at 5.

Case 1:21-cv-00291-RKE Document 44 Filed 04/24/23 Page 7 of 15



at which the *foreign like product* is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country." *Id.* § 1677b(a)(1)(B)(i) (emphasis added). The antidumping statute defines "foreign like product" as merchandise that is either identical with, or similar to, subject merchandise, according to a hierarchy of characteristics.[6] *Id.* § 1677(16)(A)-(C).

Commerce uses its model-match method to make "[d]eterminations of both identical and like/similar (i.e., non-identical but capable of comparison) merchandise." *Manchester Tank & Equip. Co. v. United States*, 44 CIT __, __, 483 F. Supp. 3d 1309, 1314 (2020). Products may be considered identical "despite the existence of minor differences in physical characteristics, if those minor differences are not commercially significant." *Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1384 (Fed. Cir. 2001). Determining whether a physical difference between products is commercially significant, i.e., one "that merits distinguishing between identical and similar products," is a fact-intensive inquiry. *See Manchester Tank*, 44 CIT at __, 483 F. Supp. 3d

---

6 The statute lists these characteristics, in order of preference:

(A) The subject merchandise and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.

(B) Merchandise—
(i) produced in the same country and by the same person as the subject merchandise,
(ii) like that merchandise in component material or materials and in the purposes for which used, and
(iii) approximately equal in commercial value to that merchandise.

(C) Merchandise—
(i) produced in the same country and by the same person and of the same general class or kind as the subject merchandise,
(ii) like that merchandise in the purposes for which used, and
(iii) which the administering authority determines may reasonably be compared with that merchandise.

19 U.S.C. § 1677(16)(A)-(C).

at 1316, 1317 ("Considering the record as a whole, Commerce has supported with substantial evidence its decision to accept as commercially significant the distinction between zinc and non-zinc coatings because zinc coating requires unique production processes, is specifically requested by customers, and leads to price variations."). This inquiry may involve a consideration of whether and to what extent the industry at large treats the difference as significant. *See Pesquera Mares*, 266 F.3d at 1384-85 (cleaned up) (affirming Commerce's finding that "the differences between super-premium and premium salmon do not warrant separate classification in an antidumping analysis," where Commerce relied on record evidence of the "commercial practice of the world's largest salmon farming countries whose salmon industries also exported to" the third-country market, Japan). Relying on industry-wide data, instead of a smaller, company-specific dataset, avoids the risk of manipulation of sales information by the respondent. *See id.* at 1385 ("Indeed, if Commerce were to limit itself to consideration of the small volume of 'premium' sales of the particular exporter, it would risk market manipulation for antidumping purposes.").

This Court and the Federal Circuit "have looked for 'compelling reasons' when Commerce [itself] modifies a model-match methodology in a review after having used that methodology in previous segments of the proceeding." *Manchester Tank*, 44 CIT at __, 483 F. Supp. 3d at 1315 (first citing *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1380 (Fed. Cir. 2008); then citing *Koyo Seiko Co. v. United States*, 31 CIT 1512, 1517-18, 516 F. Supp. 2d 1323, 1331-32 (2007), *aff'd* 551 F.3d 1286 (Fed. Cir. 2008); and then citing *Fagersta Stainless AB v. United States*, 32 CIT 889, 894-95, 577 F. Supp. 2d 1270, 1276-77 (2008)). "'Compelling reasons' require the agency to provide 'compelling and convincing evidence that the existing model-match criteria are not reflective of the merchandise in question, that there have been changes in the relevant industry, or that there is some other compelling reason' requiring the change." *Id.* (quoting *Fagersta*, 32 CIT

at 894, 577 F. Supp. 2d at 1277). So too, must respondents provide a compelling reason to change the model-match criteria by presenting their proposed modifications and supporting evidence to Commerce during the administrative process. *See Ghigi 1870 S.p.A. v. United States*, 45 CIT __, __, 547 F. Supp. 3d 1332, 1349 (2021).

## DISCUSSION

Plaintiffs' main argument is that Commerce's refusal to adjust its model-match method with respect to protein coding lacks the support of substantial evidence, because the information presented in their Market Report is compelling and unrebutted. Pls.' Br. at 3 ("[U]nrebutted substantial evidence showed that pasta with protein content 12.5% was standard pasta, not premium pasta, in both the U.S. market and the Italian market."). Plaintiffs also challenge Commerce's refusal to adjust its method for scalar differences and rounding rules, instead of coding protein content based solely on the nutrition label.[7] *Id.*

In the Final Results, Commerce found the Market Report data provided unreliable and insufficient evidence of an industry-wide change to a 13.5% breakpoint between standard and premium pasta to justify adjusting its model-match method for reporting protein content:

> The U.S. section of the Market Report consists of labels and receipts for pasta purchased from Washington DC metro area supermarkets along with charts illustrating the relationship between protein content and price. Valdigrano asserts that these data show 12.5 percent protein content is a floor for pasta sold in the U.S. market, and that the true breakpoint between standard and premium pasta is 13.5 percent protein content. We do not find this evidence sufficient to change our existing coding for protein content. The Market Report data cited to in the case brief consist of pasta purchases from four supermarkets in a small geographic region of

---

[7] *See supra* notes 4 and 5. As noted, Plaintiffs assert that the scalar differences stem from the differences in the nitrogen multiplier required by U.S. and Italian regulations: "U.S. FDA rules calculate protein content by multiplying the nitrogen content by 6.25 while the Italian standard calculates protein content by multiplying the same nitrogen content by 5.7." Pls.' Br. at 43. Under FDA rounding rules, Plaintiffs argue, the percentage of protein reported on the nutrition label of a product sold in the United States could be artificially inflated or reduced. *See id.* at 5.

> the United States. *No attempt is made in the Market Report to address the potential for manipulation in choice of purchases or to support a claim that these purchases are reflective of the entire U.S. market for pasta products*. As such, we do not find these data to be a "compelling reason" to change the instructions for reporting protein content.
>
> For Italy, Valdigrano cites to a screenshot in the Market Report of the Bologna Grain Exchange's website defining "superior" semolina as having 13.5 percent or greater protein content to assert that the industry standard for defining premium and standard semolina has changed and, thus, that there is a "compelling reason," . . . for Commerce to change the breakpoint for reporting protein content. However, in the [memorandum that supported the 12.5 percent breakpoint, i.e., the Wheat Code Memo], Commerce relied on the breakpoints of *three* separate Italian commodity exchanges. The plain meaning of "industrywide" connotes an *entire* industry or, at the very least, predominance or prevalence within an industry. *We find that the Market Report's citation to a single exchange's breakpoint is not sufficient evidence of an industry-wide change in standards from semolina and thus that it is not a compelling reason to change the instructions for reporting protein content*.

Final IDM at 11-12 (emphasis added) (citations omitted).

Regarding Plaintiffs' contention that Commerce must adjust its method for scalar differences and rounding rules, instead of coding protein content based solely on the nutrition label, Commerce stated:

> Commerce has considered and rejected the claims regarding rounding and nitrogen conversion factors in prior reviews and in doing so has repeatedly emphasized the importance of transparency and consistency. We do the same here. Given that the protein content physical characteristic was created, in part, based on the finding that "there is not a clearly defined method of identifying premium pasta other than the protein content marked on the packages," we find that relying on values not shown on the packaging label for this physical characteristic would detract from the consistency and transparency of defining each product (*i.e.*, CONNUM), which in turn implicates the accuracy of the product comparisons (*i.e.*, the identification of identical or similar merchandise sold in the Italian market based on whether the pasta sold in each market is premium or not).

*Id.* at 10 (citing comment 1 in final decisional memorandum accompanying final results of twelfth administrative review). Put another way, Commerce declined, when it was constructing

CONNUMs, to rely on information other than that displayed on the packaging label because doing so would result in less transparency and consistency than by using the label.

Additionally, Commerce found there was no evidence that the differences in Italian and U.S. protein measurement standards were commercially significant:

> Given that we have found "there is not a clearly defined method of identifying premium pasta other than the protein content marked on the packages," we do not see a basis to find the discrepancy in protein measurement standards between the U.S. and Italian markets as commercially significant when the market perception of premium pasta or non-premium pasta relies on information readily available to consumers, namely the packaging label associated with the pasta in the marketplace.

*Id.* at 11. That is, the information on packaging labels allows consumers to readily distinguish premium and standard pasta and make purchasing decisions. For Commerce, there was no evidentiary basis to conclude that differences in nitrogen multipliers and rounding rules, which is not information readily available to consumers, mattered in the marketplace. Thus, Commerce found that the differences were not commercially significant.

The court finds, based on this record, that Commerce did not err when it declined to adjust its existing model-match method. Plaintiffs have failed to demonstrate by "'compelling and convincing evidence that the existing model-match criteria are not reflective of the merchandise in question, that there have been changes in the relevant industry, or that there is some other compelling reason' requiring the change." *Manchester Tank*, 44 CIT at __, 483 F. Supp. 3d at 1315 (quoting *Fagersta*, 32 CIT at 894, 577 F. Supp. 2d at 1277).

First, the court cannot fault Commerce for finding that the Market Report was insufficient to support Plaintiffs' claim that the 12.5% breakpoint is out of step with current industry-wide standards because no serious argument can be made that the report is representative of the entire industry either in the United States or in Italy. When Commerce has reconsidered its model-match

criteria in the past, it has stated that for data to be "industry-wide" it must be public, published information. *See* Letter from Kelley Drye & Warren to Sec'y of Commerce (Dec. 20, 2019) Ex. 2, at 6, PR 108 ("Wheat Code Mem.") ("Because we strive to identify a universal set of criteria which apply to all respondents in this proceeding, we looked to publicly available information and published industry standards for guidance."). In contrast, the report here was prepared for presentation to Commerce, and bears no indicia of having been publicized or published to or by the industry at large. Rather, the report presents the retail prices of pasta products of different shapes that were sold by several different brands, which Plaintiffs' counsel purchased from four supermarkets in the suburbs of Washington, D.C. (Safeway, Giant, Harris Teeter, and Balducci's) and at one Italian supermarket (Pam Panorama S.p.A.). *See* Market Report Exs. M & L.

The report also contains a screenshot of a website page of a single grain exchange in Bologna, which is cited as evidence of market-wide acceptance of 13.5% as the new minimum for premium pasta. *See* Market Report Ex. K. But there is nothing in the report that indicates that this single Bologna exchange represents the entire market or even a large portion of it. Indeed, while in the past this particular grain exchange was one of three Italian exchanges considered by Commerce, alongside one commodity exchange in Bologna and another in Milan, no evidence from the other two exchanges is included in the report. For this reason, Commerce reasonably found the Market Report insufficient to support a change in the standard-to-premium breakpoint from 12.5% to 13.5%.

The report itself is neither public, nor published outside of this litigation, nor is there a basis to conclude that it is objectively reliable. As Commerce stated:

> No attempt is made in the Market Report to address the potential for manipulation in choice of purchases or to support a claim that these purchases are reflective of the entire U.S. market for pasta products. As such, we do not find these data to be a "compelling reason" to change the instructions for reporting protein content.

Final IDM at 12. Further, Commerce found:

> [T]he Market Report's citation to a single exchange's breakpoint is not sufficient evidence of an industry-wide change in standards from semolina and thus that it is not a compelling reason to change the instructions for reporting protein content.

*Id.* Indeed, Plaintiffs do not deny the report's limitations. Instead, they appear to argue that, limited as it might be, the Market Report is the only evidence on the record: "The Market Report was unrebutted. It was submitted near the outset of the proceeding, and the petitioners had ample opportunity to submit rebuttal factual evidence. Instead, petitioners were silent." Pls.' Br. at 13; *id.* at 33 ("Petitioners' failure to provide any evidence of such different treatment in different commodity exchanges compels Commerce to accept the finding of the Market Report. There is simply no reason to disbelieve the exhibit in the Market Report, and indeed, Commerce does not dispute its correctness.").

Just because evidence is unrebutted, however, does not make it substantial. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). It cannot be said that the Market Report reasonably supports the conclusion that *industry-wide* the minimum protein content of premium pasta is 12.5% in the United States or that the industry in Italy has recognized a protein minimum of 13.5% because (1) the report does not represent the entire U.S. industry but, at best, only the experience of a handful of stores in the Washington, D.C. suburbs, and (2) a single screenshot from one grain exchange in Italy that states (as translated from the Italian in Exhibit L of the Market Report), "semolina with characteristics superior to the regulation – minimum protein 13.5%," cannot reasonably be understood to mean that the entire Italian industry as a whole has increased the minimum protein content of premium pasta from 12.5% to 13.5%. This is not to say that information from exchanges in Italy cannot be the source of industry-wide data, but, as

Commerce indicated in the Final IDM, it must be representative, i.e., the data of more than one exchange. Again, the 12.5% breakpoint was established by three exchanges. *See* Final IDM at 12 (emphasis in original) ("[I]n the [original report that supported the 12.5 percent breakpoint, i.e., the Wheat Code Memo], Commerce relied on the breakpoints of *three* separate Italian commodity exchanges. The plain meaning of 'industry-wide' connotes an *entire* industry or, at the very least, predominance or prevalence within an industry." (citing Wheat Code Mem.)); *see also Manchester Tank*, 44 CIT at __, 483 F. Supp. 3d at 1315 (quoting *Fagersta*, 32 CIT at 894, 577 F. Supp. 2d at 1277) ("'Compelling reasons' require the agency to provide 'compelling and convincing evidence . . . that there have been changes in the relevant industry['] . . . requiring the change.").

Moreover, the court finds no error with respect to Commerce's conclusion that differences in Italian and U.S. protein measurement standards and rounding rules were not commercially significant. It is unrebutted that consumers rely on packaging information when making pasta purchasing decisions, and that coding for protein content based on the nutrition label fosters transparency and consistency in CONNUM-building.[8] Where the parties disagree is whether the Market Report constitutes substantial record evidence that differences in Italian and U.S. protein measurement standards were commercially significant. For the reasons discussed above, it does not.

Even if the court were to take into account the pricing data in the Market Report, remand would not be required here, because at best, Plaintiffs have offered an alternative conclusion to the one reached by Commerce. Plaintiffs have failed to demonstrate that Commerce's conclusion—

---

[8] Though unrebutted, the court notes that Commerce's reliance on the finding that customers make purchasing decisions based on information found on a pasta product's packaging departs from the relevant inquiry, which focuses on the physical characteristics of the product, not its packaging.

that values other than those readily available to consumers on the packaging label were not commercially significant—was unreasonable. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (describing substantial evidence as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence"). Therefore, the court sustains Commerce's Final Results.

**CONCLUSION**

Based on the foregoing, the court denies Plaintiffs' motion and sustains the Final Results. Judgment will be entered accordingly.

/s/ Richard K. Eaton
Judge

Dated: April 24, 2023
New York, New York

*Proof of Service*

FORM 30. Certificate of Service

Form 30
July 2020

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

**Case Number** 2023-2060

**Short Case Caption** La Molisana, S.p.A., Valdigrano di Flavio Pagani S.R.L. v. United States

**NOTE:** Proof of service is only required when the rules specify that service must be accomplished outside the court's electronic filing system. See Fed. R. App. P. 25(d); Fed. Cir. R. 25(e). Attach additional pages as needed.

I certify that I served a copy of the foregoing filing on 09/26/2023

by ☐ U.S. Mail ☐ Hand Delivery ☑ Email ☐ Facsimile
☑ Other: CAFC CM/ECF

on the below individuals at the following locations.

| Person Served | Service Location (Address, Facsimile, Email) |
|---|---|
| Sosun Bae, Esq. | Sosun.Bae@usdoj.gov |
| | |
| | |
| | |
| | |

☐ Additional pages attached.

Date: ________________

Signature: /s/ David Craven

Name: David Craven

*Certificate of Compliance*

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2023-2060

**Short Case Caption:** La Molisana, S.p.A., Valdigrano di Flavio Pagani S.R.L. v. US

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 8924 words.

☐ the filing has been prepared using a monospaced typeface and includes ______ lines of text.

☐ the filing contains ______ pages / ______ words / ______ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ______).

Date: 09/26/2023

Signature: /s/ David Craven

Name: David Craven

Save for Filing