No. 2023-2060

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

_____

LA MOLISANA S.P.A., VALDIGRANO DI FLAVIO PAGANI S.R.L.,
Plaintiffs-Appellants,

v.

UNITED STATES,
Defendants-Appellee.

_____

Appeal from the United States Court of International Trade in
Case No. 21-00291, Senior Judge Richard K. Eaton

_____

**<u>BRIEF OF DEFENDANT-APPELLEE THE UNITED STATES</u>**

<div style="margin-left:50%">

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

REGINALD T. BLADES, Jr.
Assistant Director

</div>

OF COUNSEL:

CHRISTOPHER KIMURA
Office of the Chief Counsel for
Trade Enforcement & Compliance
Department of Commerce

SOSUN BAE
Senior Trial Counsel
U.S. Department of Justice
Civil Division
PO Box 480
Ben Franklin Station
Washington, D.C. 20044
Tell: (202) 305-7568
Fax: (202) 307-0972
Email: sosun.bae@usdoj.gov

November 9, 2023                    *Attorneys for Defendant-Appellee*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................ iii

STATEMENT OF THE ISSUE ............................................................ 1

STATEMENT OF THE CASE ............................................................. 1

I.     Nature Of The Case ................................................................... 1

II.    Relevant Legal Framework ........................................................ 2

       A.    Commerce's Issuance Of Antidumping Duty Orders ......... 2

       B.    Scheme For Conducting Administrative Reviews ............... 3

       C.    Commerce's Model Match Methodology ........................... 4

             1.    General Framework For Model Matching ................. 4

             2.    Model Match Methodology For Pasta From Italy ..... 7

III.   Statement Of Facts And Course Of Proceedings Below .............. 9

       A.    Administrative Proceedings Before Commerce .................. 9

       B.    Trial Court Proceedings ................................................. 12

SUMMARY OF THE ARGUMENT .................................................. 13

ARGUMENT .............................................................................. 14

I.     Standard Of Review .............................................................. 14

II.    Commerce Relies On The Packaging Label To Compare Products
       On A Consistent And Transparent Basis, And The Differences
       Caused By FDA Rounding Standards And The Slight Variation
       In Nitrogen Multipliers Are Not Commercially Significant ......... 16

A.    Commerce's Current Model Match Methodology ............................. 17

B.    Earlier Challenges To Commerce's Model Match Methodology ....... 19

C.    Any Minor Differences Caused By The FDA Rounding
      Requirement And Differing Nitrogen Content Multipliers
      Are Not Commercially Significant And Do Not Constitute
      Compelling Reasons Requiring Commerce To Change Its
      Methodology ..................................................................................... 20

III.   The Market Report Is Not Compelling Evidence Requiring A
       Deviation From The Current 12.5 Percent Dividing Line ............................ 24

CONCLUSION .................................................................................................... 28

# TABLE OF AUTHORITIES

<u>Cases</u>

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
   802 F.3d 1339 (Fed. Cir. 2015) ............................................................15

*Atl. Sugar, Ltd. v. United States*,
   744 F.2d 1556 (Fed. Cir. 1984) ............................................................16

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
   467 U.S. 837 (1984)...............................................................................16

*Consol. Edison Co. v. NLRB*,
   305 U.S. 197 (1938)....................................................................... 15, 26

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966)...............................................................................15

*Fagersta Stainless AB v. United States*,
   577 F. Supp. 2d 1270 (Ct. Int'l Trade 2008) ............................... passim

*Fujitsu Gen. Ltd. v. United States*,
   88 F.3d 1034 (Fed. Cir. 1996) ..............................................................15

*JFB Rak LLC v. United States*,
   961 F. Supp. 2d 1274 (Ct. Int'l Trade 2014) .........................................6

*Koyo Seiko Co., Ltd. v. United States*,
   66 F.3d 1204 (Fed. Cir. 1995) ........................................................5, 17

*Koyo Seiko Co., Ltd. v. United States*,
   516 F. Supp. 2d 1323 (Ct. Int'l Trade 2007), *aff'd*,
   551 F.3d 1286 (Fed. Cir. 2008) ..............................................................6

*La Molisana S.p.A. v. United States*,
   633 F. Supp. 3d 1266 (Ct. Int'l Trade 2023) .........................................2

*La Molisana S.p.A. v. United States*,
   No. 16-00047, 2018 WL 3089242 (Ct. Int'l Trade June 21, 2018), *aff'd*,
   784 F. App'x 780 (Fed. Cir. 2019) ......................................................21

*Manchester Tank & Equip. Co. v. United States*,
    483 F. Supp. 3d 1309 (Ct. Int'l Trade 2020) .......................................................6

*Maverick Tube Corp. v. United States*,
    107 F. Supp. 3d 1318 (Ct. Int'l Trade 2015) .......................................................6

*Nan Ya Plastics Corp. v. United States*,
    810 F.3d 1333 (Fed. Cir. 2016) ...........................................................................27

*New World Pasta Co. v. United States*,
    316 F. Supp. 2d 1338 (Ct. Int'l Trade 2004) .......................................................5

*Nippon Steel Corp. v. United States*,
    337 F.3d 1373 (Fed. Cir. 2003) ...........................................................................15

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006) ...........................................................................16

*Pesquera Mares Australes Ltda. v. United States*,
    266 F.3d 1372 (Fed. Cir. 2001) .................................................................. passim

*Prodotti Alimentari Meridioli, S.r.L., v. United States*,
    27 C.I.T. 547 (2003) .............................................................................................7

*SKF USA Inc. v. United States*,
    537 F.3d 1373 (Fed. Cir. 2008) .......................................................................4, 6

*Torrington Co. v. United States*,
    82 F.3d 1039 (Fed. Cir. 1996) .............................................................................16

*Union Steel v. United States*,
    713 F.3d 1101 (Fed. Cir. 2013) ...........................................................................15

*Union Steel v. United States*,
    823 F. Supp. 2d 1346 (Ct. Int'l Trade 2012) .......................................................6

<u>Statutes</u>

19 U.S.C. § 1516a ...................................................................................................15

19 U.S.C. § 1673 .......................................................................................................2

19 U.S.C. § 1673d......................................................................................................3

19 U.S.C. § 1675 ..............................................................................................2, 4

19 U.S.C. § 1677(16) .................................................................................... 4, 5, 6

19 U.S.C. § 1677b ...............................................................................................3

Regulations

19 C.F.R. § 351.205(a) ........................................................................................3

19 C.F.R. § 351.207 ............................................................................................3

19 C.F.R. § 351.210 ............................................................................................3

21 C.F.R. § 101.9(c)(7) .....................................................................................10

<div align="center">Other Authorities</div>

*Certain Pasta From Italy*,
61 Fed. Reg. 30,326 (Dep't of Commerce June 14, 1996) .......................................7

*Certain Pasta From Italy*,
64 Fed. Reg. 6,615 (Dep't of Commerce Feb. 10, 1999) ........................................8

*Certain Pasta from Italy*,
75 Fed. Reg. 6,352 (Dep't of Commerce Feb. 9, 2010) ...........................................8

*Certain Pasta from Italy*,
78 Fed. Reg. 9,364 (Dep't of Commerce Feb. 8, 2013) .........................................19

*Initiation of Antidumping and Countervailing Duty Admin. Revs.*,
84 Fed. Reg. 47,242 (Dep't Commerce Sept. 9, 2019) ............................................9

*Certain Pasta from Italy*,
85 Fed. Reg. 2,714 (Dep't of Commerce Jan. 16, 2020) .......................................20

*Certain Pasta from Italy*,
86 Fed. Reg. 28,336 (Dep't of Commerce May 26, 2021) .......................................2

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Rule 47.5, defendant-appellee's counsel states that she is unaware of any other appeal in or from this action that previously was before this court or any other appellate court under the same or similar title.  Counsel is also unaware of any case pending in this or any other court that may directly affect or be affected by the Court's decision in this appeal.

No. 2023-2060

—————————————————————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

—————————————————————————

LA MOLISANA S.P.A., VALDIGRANO DI FLAVIO PAGANI S.R.L.,
Plaintiffs-Appellants,

v.

UNITED STATES,
Defendants-Appellee.

—————————————————————————

Appeal from the United States Court of International Trade in
Case No. 21-00291, Senior Judge Richard K. Eaton

—————————————————————————

## BRIEF OF DEFENDANT-APPELLEE THE UNITED STATES

## STATEMENT OF THE ISSUE

Whether the Department of Commerce's (Commerce) protein content reporting instructions are supported by substantial evidence and otherwise in accordance with law.

## STATEMENT OF THE CASE

I.    Nature Of The Case

This appeal concerns a challenge by plaintiffs-appellants, La Molisana S.p.A. (La Molisana) and Valdigrano Di Flavio Pagani S.r.l. (Valdigrano), to Commerce's final results in the twenty-third administrative review of the

antidumping duty order covering certain pasta from Italy. *See Certain Pasta from Italy*, 86 Fed. Reg. 28,336 (Dep't of Commerce May 26, 2021) (final results), Appx000056-000058, and accompanying Issues and Decision Memorandum (IDM). Appx008239-008260.

Plaintiffs-appellants appeal from the final judgment of the United States Court of International Trade (trial court) in *La Molisana S.p.A. v. United States*, 633 F. Supp. 3d 1266 (Ct. Int'l Trade 2023). Appx000036-000051. Specifically, plaintiffs-appellants appeal the trial court's decision to sustain Commerce's final results with respect to Commerce's protein content reporting methodology.

II.    Relevant Legal Framework

A.    Commerce's Issuance Of Antidumping Duty Orders

The Tariff Act of 1930, as amended, establishes a remedial regime to combat unfair trade practices. If Commerce "determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value," it will impose an antidumping duty on the merchandise in the amount that "the normal value exceeds the export price." 19 U.S.C. § 1673. Thus, in an antidumping proceeding, Commerce determines whether subject merchandise is being, or is likely to be, sold at less than fair value in the United States by comparing the export price (the price of the goods sold in the United States) and the "normal value" of the merchandise. *See* 19 U.S.C. §§ 1673, 1675(a)(2)(A),

(C), 1677b(a).  Using as a comparator normal value sales that are made above cost, if Commerce finds that a foreign producer or importer is selling its goods in the United States for less than these normal value sales, Commerce makes an affirmative determination of dumping.  The United States International Trade Commission (ITC), in turn, determines whether such dumping has "materially injured" or threatens material injury to a United States industry.  19 U.S.C. § 1673d(b)(1).

If Commerce makes a final determination that "the subject merchandise is being, or is likely to be, sold in the United States at less than its fair value," and if the ITC makes a final determination that a United States industry has suffered injury or is threatened with material injury, Commerce issues an antidumping duty order.  *See* 19 U.S.C. § 1673d(a)(1), (b)(1), (c)(2); *see also* 19 C.F.R. § 351.207; 19 C.F.R. §§ 351.205(a), 351.210(a).  Such an order imposes a duty in an amount equal to the amount by which the normal value exceeds the export price (or the constructed export price).

B.    Scheme For Conducting Administrative Reviews

Respondents and petitioners may request an annual administrative review of entries in which Commerce again determines the United States price and normal value for respondents subject to the review.  This enables Commerce to update the dumping margins and assessment rates to reflect the trading activity during the

review period.  *See* 19 U.S.C. § 1675.  Commerce has broad authority to limit the number of respondents in an administrative review when it is not practicable to examine all known producers and exporters of the subject merchandise.  These individually examined companies are commonly referred to as mandatory respondents.

To conduct a dumping analysis for the mandatory respondents, Commerce must obtain from respondents the information necessary to determine the United States prices and the normal value information. Commerce does this by issuing an extensive initial questionnaire and supplemental questionnaires, as necessary.

C.    Commerce's Model Match Methodology

1.    General Framework For Model sMatching

To establish a dumping margin, whether in an initial investigation or a subsequent administrative review, Commerce must first identify the "foreign like product" that will form the basis for comparison to merchandise exported to the United States.  19 U.S.C. § 1677(16); *see also Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1375 (Fed. Cir. 2001).  Because Congress has not mandated the precise methodology by which Commerce must identify the "foreign like product," Congress has implicitly delegated that authority to Commerce.  *Id*. at 1384. Commerce has "considerable discretion" to define the "foreign like product" in an antidumping proceeding.  *SKF USA Inc. v. United States*, 537 F.3d 1373,

1379 (Fed. Cir. 2008).  In addition, this Court has held that Commerce's model match methodology is entitled to *Chevron* deference.  *See Koyo Seiko Co., Ltd. v. United States*, 66 F.3d 1204, 1209 (Fed. Cir. 1995).  Thus, Commerce's methodology should be upheld if it constitutes a permissible construction of that statute.  *Id.* at 1209-10.

In *New World Pasta Co. v. United States*, 316 F. Supp. 2d 1338, 1352 (Ct. Int'l Trade 2004), the trial court explained that, in defining a "foreign like product" for purposes of 19 U.S.C. § 1677(16)(A), "Commerce is constrained both by statute and by its own past practice."  As a result, the court found that Commerce must base product-matching criteria on "physical characteristics," and recognized that Commerce's practice is to consider only "meaningful" or "significant" physical differences.  *Id*. at 1352-53 (quoting 19 U.S.C. § 1677(16)(A)).  In determining what is "meaningful" or "significant," the trial court acknowledged that Commerce looks at both "price differences in the marketplace and cost differences which may reflect different production processes."  *Id*. at 1353-54 (citation omitted).  Moreover, "{i}dentical" products do not have to be exactly the same.  Rather, "merchandise should be considered to be identical despite the existence of minor differences in physical characteristics, if those minor differences are not commercially significant."  *Pesquera Mares*, 266 F.3d at 1384. Commerce determines what constitutes "commercially significant" physical

differences on a case-by-case basis. *See Fagersta Stainless AB v. United States*, 577 F. Supp. 2d 1270, 1279 (Ct. Int'l Trade 2008).

Model match methodologies are based on a hierarchy of commercially significant product characteristics for the relevant product that Commerce uses to create control numbers (CONNUMS), which identify unique products for comparison. *JFB Rak LLC v. United States,* 961 F. Supp. 2d 1274, 1283-84 (Ct. Int'l Trade 2014); *Union Steel v. United States*, 823 F. Supp. 2d 1346, 1349 (Ct. Int'l Trade 2012). Commerce's model matching methodologies are based on the physical characteristics of products. *See* 19 U.S.C. § 1677(16)(A). This Court has stated that "differences in costs do not constitute differences in products in and of themselves." *Maverick Tube Corp. v. United States,* 107 F. Supp. 3d 1318, 1330 (Ct. Int'l Trade 2015).

Once Commerce has established a model-match methodology, it uses consistent and uniform model-matching criteria for respondents in antidumping proceedings; Commerce also has a longstanding practice not to modify that methodology in subsequent proceedings unless there are "compelling reasons" to do so. *Manchester Tank & Equip. Co. v. United States*, 483 F. Supp. 3d 1309, 1315 (Ct. Int'l Trade 2020) (citing *SKF USA*, 537 F.3d at 1380; *Koyo Seiko v. United States*, 516 F. Supp. 2d 1323, 1331-32 (Ct. Int'l Trade 2007), *aff'd*, 551 F.3d 1286 (Fed. Cir. 2008); and *Fagersta*, 577 F. Supp. 2d at 1276-77).

Commerce considers compelling reasons to exist if a party proves by "'compelling and convincing evidence" that the existing model-matching criteria 'are not reflective of the merchandise in question,' that there have been changes in the relevant industry, or that 'there is some other compelling reason present which requires a change.'" *Fagersta*, 577 F. Supp. 2d at 1277 (citation omitted).

2.    <u>Model Match Methodology For Pasta From Italy</u>

With regard to pasta from Italy, the product at issue in this appeal, Commerce established the model match methodology during the investigation and has refined it in its subsequent reviews. In doing so, Commerce consulted with both domestic petitioners and Italian pasta respondents. *See Prodotti Alimentari Meridioli, S.r.L., v. United States*, 27 C.I.T. 547, 548 (2003).

In 1996, Commerce issued its final investigation determination. *See Certain Pasta From Italy*, 61 Fed. Reg. 30,326 (Dep't of Commerce June 14, 1996) (final determination). As part of the investigation, Commerce established a model match methodology to ensure that comparisons are made for contemporaneous sales of products that are either identical or similar with respect to several characteristics, such as pasta shape, wheat type, additives and enrichment. *See id*. This methodology has served as a consistent and uniform basis for model matching in

all subsequent administrative reviews of the order, stretching decades.[1] *See*, *e.g.,*

*Certain Pasta From Italy*, 64 Fed. Reg. 6,615 (Dep't of Commerce Feb. 10, 1999)

(final results), and accompanying IDM.

In the twelfth administrative review, Commerce modified the pasta

CONNUM, determining that its treatment of separate wheat codes in model match

decisions in previous determinations had lacked consistency. *See Certain Pasta*

*from Italy*, 75 Fed. Reg. 6,352 (Dep't of Commerce Feb. 9, 2010) (final results),

and accompanying 2007-2008 IDM at cmt. 1 (12th Administrative Review IDM).

In making this modification, Commerce outlined previous challenges in defining

"superior" semolina and incorporating that criterion as a physical characteristic.  A

particular concern was that, in prior reviews, model match decisions were based on

company-specific information, leading to inconsistencies in the definition of the

physical characteristics of the in-scope merchandise for different respondents.

Commerce sought to reduce the subjectivity and potential for variation from

respondent to respondent and review to review.  *See id.*  In seeking to develop

objective criteria that would apply in each subsequent review of the order,

Commerce replaced the wheat code field with three fields: wheat species, form,

and, of particular relevance to this appeal, protein content.

---

[1]  Commerce has revised certain aspects of the methodology when it has found compelling reasons to do so.

III.    Statement Of Facts And Course Of Proceedings Below

     A.    Administrative Proceedings Before Commerce

In September 2019, Commerce initiated the twenty-third administrative review of the antidumping duty order covering certain pasta from Italy. *See Initiation of Antidumping and Countervailing Duty Admin. Revs.*, 84 Fed. Reg. 47,242 (Dep't Commerce Sept. 9, 2019). Commerce selected La Molisana as one of the mandatory respondents; Valdigrano participated in the proceeding as a non-individually-examined respondent.

In November 2019, Commerce issued its initial antidumping questionnaire to La Molisana. Appx001220-001386. Of relevance to this appeal, Commerce asked La Molisana to "[i]dentify the percentage of protein in the pasta sold, as stated on the label of the respective product{.}" Appx001257-001258 (home market sales), Appx001286 (United States sales). Commerce also instructed La Molisana to code pasta with a protein content of 12.5 percent or more as "1" (premium), and pasta with a protein content of 10.00-12.49 percent as "2" (standard), based on the protein content listed on the nutrition label of the packaging. *Id.* The "1" or "2," in turn, would become a digit in the CONNUM for a particular product. La Molisana complied with Commerce's instructions, but complained that, "due to the nature of the nutrition facts panel and other incontrovertible facts, this is not necessarily an accurate representation of the

Protein Content." Appx003077, Appx003144.

In their administrative case briefs, plaintiffs-appellants argued that the instructions for coding protein content should be adjusted to ensure that Commerce compares physically similar pasta products. Specifically, Valdigrano contended that the 12.5 percent breakpoint between premium and standard pasta did not reflect current market reality, citing as "evidence" a "market report" prepared by Valdigrano's own counsel (based on a limited number of pasta purchases made in the Washington DC area), and a screenshot from the Bologna Grain Exchange. Appx002143-002148, Appx002360. La Molisana claimed that Commerce's reliance on the protein content listed on the product label was flawed because the U.S. Food and Drug Administration (FDA) reporting standards requiring rounding on nutrition facts panels rendered the protein content reporting inaccurate,[2] and that the slightly differing protein measurement calculation methodologies between the United States and Italy resulted in comparisons between physically dissimilar products. Appx007939-007940.

---

[2] All food manufacturers are required by the FDA to label packages for protein content by rounding the amount of protein to the nearest gram. *See* 21 C.F.R. §101.9(c)(7). Specifically, food manufacturers must include on the packaging label "{a} statement of the number of grams of protein in a serving, expressed to the nearest gram, except that if a serving contains less than 1 gram, the statement 'Contains less than 1 gram' or 'less than 1 gram' may be used as an alternative, and if the serving contains less than 0.5 gram, the content may be expressed as zero." *Id.*

In its final results, Commerce addressed the parties' concerns but declined to adjust its model match methodology. Appx008244-008250. Commerce first addressed protein measurement and labeling standards, observing that the arguments raised by La Molisana had been raised and rejected in prior reviews and that the current protein content reporting instructions had been in place for more than a decade. Appx008245-008248. Commerce explained that relying on values not shown on the packaging label would detract from the consistency and transparency of defining each product, and that the discrepancy in protein measurement standards between the United States and Italy was not commercially significant because market perception of premium and standard pasta relies on the information included in the packaging label, which is readily available to consumers. Appx008248-008249.

With respect to the 12.5 percent breakpoint between premium and standard pasta, Commerce found that the "market report" did not constitute compelling evidence warranting a change in the existing coding instructions because it relied on pasta purchases from only four supermarkets in a concentrated geographic area, and explained that the data could have been manipulated through the choice of pasta purchases. Appx008429-008430. Commerce also determined that the Bologna Grain Exchange's purported use of a 13.5 percent breakpoint was not sufficient evidence of an industry-wide change, especially because Commerce had

11

relied on the breakpoints of three separate Italian exchanges when establishing the 12.5 percent breakpoint.

   B.    Trial Court Proceedings

   La Molisana and Valdigrano appealed the final results to the Court of International Trade.  On April 24, 2023, the trial court entered an opinion sustaining the final results.  Appx000037-000051.  The court held that Commerce did not err in declining to adjust its current model match methodology because La Molisana and Valdigrano had failed to demonstrate by compelling and convincing evidence that the existing criteria are not reflective of the merchandise in question, that there have been changes in the industry, or that another compelling reason requires the change.  Appx000047.

   With regard to the market report, the court explained that there could be no serious argument made that the report was representative of the entire industry, finding that the report bears no indicia of having been published to or by the industry at large, but that it was prepared by Valdigrano's counsel for Commerce.  Appx000048-000049.  The court also discounted the screenshot purporting to show the 13.5 percent breakpoint of the Bologna Grain Exchange, agreeing that no evidence existed to show that the single exchange was representative of the entire Italian market.  Appx000049.  Finally, the court rejected the argument that the report was unrebutted, remarking that, "{j}ust because evidence is unrebutted . . .

does not make it substantial{,}" and concluding that the market report did not reasonably support the conclusion that, industry-wide, the protein breakpoint should be at 13.5 percent rather than 12.5 percent. Appx000049.

The trial court then addressed the arguments regarding the differences in Italian and United States protein measurement standards and the FDA's rounding rules, upholding Commerce's conclusion that these distinctions were not commercially significant. Appx000050. The court observed that neither La Molisana nor Valdigrano had rebutted Commerce's findings that consumers rely on packaging information when making their purchasing decisions, and that coding for protein content based on the nutrition facts label fosters transparency and consistency. *Id.*

Finally, the trial court explained that, even if it were to take into account the pricing data in the market report, remand would not be appropriate because, at best, La Molisana and Valdigrano had merely offered an alternative conclusion to the one reached by Commerce, and that they had failed to demonstrate that Commerce's conclusion was unreasonable. Appx000050-000051.

Accordingly, the trial court sustained the final results in their entirety. This appeal followed.

## <u>SUMMARY OF THE ARGUMENT</u>

The trial court correctly held that Commerce's decision not to adjust its

model match methodology was reasonable and supported by substantial evidence; this Court should affirm.

Plaintiffs-appellants must present compelling reasons for Commerce to depart from its longstanding, transparent, and consistent instructions for reporting protein content; they completely fail to do so. Commerce's practice and relevant case law direct Commerce to base its product-matching criteria on physical characteristics of the finished pasta. The pertinent physical characteristics of finished pasta, including the protein content, are found on the nutrition label of the product, and the trial court correctly held, based on Commerce's explanation, that coding for protein content based on the nutrition label fosters transparency and consistency in CONNUM-building. Plaintiffs-appellants' evidence and arguments do not establish that Commerce's instructions for reporting the protein content of finished pasta, in place for more than a decade, result in comparisons between physically dissimilar products or fail to reflect market reality such that Commerce must alter them. Commerce's final results are supported by the record and relevant precedent.

## **ARGUMENT**

### I.    Standard Of Review

In reviewing the trial court's judgments, this Court "reappl{ies} the statutory standard of review that the Court of International Trade applied in reviewing the

administrative record." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003). Accordingly, this Court will uphold Commerce's determination unless it is unsupported by substantial record evidence, or otherwise unlawful. *See Union Steel v. United State*s, 713 F.3d 1101, 1106 (Fed. Cir. 2013) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)); *see also Fujitsu Gen. Ltd. v. United State*s, 88 F.3d 1034, 1038 (Fed. Cir. 1996). Although precedent set by the Court of International Trade is not binding, this Court has declared that it "will not ignore the informed opinion of the {trial court}." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1348 (Fed. Cir. 2015) (cleaned up).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may also be "less than the weight of the evidence," and the possibility of drawing two different conclusions from the record does not render Commerce's findings unsupported by substantial evidence. *See Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Moreover, Commerce is accorded particular deference in antidumping and countervailing duty determinations. *See, e.g.*, *Fujitsu*, 88 F.3d at 1039 ("Antidumping and countervailing duty determinations involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts." (citation omitted)). A party disputing Commerce's determination as

unsupported by substantial evidence thus "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006), and the Court will sustain Commerce's determinations if they are reasonable and supported by the record as a whole, even if some evidence detracts from them. *See Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

When determining whether Commerce's actions accord with the law, this Court relies upon the two-step analysis set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). The Court considers first "whether Congress has directly spoken to the precise question at issue{;}" if "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 842–43. "Any reasonable construction of the statute is a permissible construction." *Torrington Co. v. United States*, 82 F.3d 1039, 1044 (Fed. Cir. 1996).

II.    Commerce Relies On The Packaging Label To Compare Products On A Consistent And Transparent Basis, And The Differences Caused By FDA Rounding Standards And The Slight Variation In Nitrogen Multipliers Are Not Commercially Significant

Plaintiffs-appellants argue that the FDA nutrition rounding rules, in conjunction with the differing nitrogen content multiplier between Italy and the United States, masks the true protein content in pasta and results in comparisons

16

between dissimilar products. However, Commerce reasonably determined that any differences in the protein content on the pasta labels resulting from the FDA rounding rules and differing nitrogen content multipliers are not commercially significant. Commerce also explained that its current practice of relying on the product label provides a consistent and transparent basis for product comparisons, and that plaintiffs-appellants' arguments were not compelling enough to warrant a change to its longstanding, reasonable, and objective model match methodology. This determination is consistent with and supported by the relevant case law of this Court and the trial court and should not be disturbed.

A.    Commerce's Current Model Match Methodology

As discussed above, Commerce's model match methodology for defining a foreign like product is entitled to *Chevron* deference and should be upheld if it constitutes a permissible construction of the relevant statute. *See Koyo Seiko*, 66 F.3d at 1209-10.

In the twelfth administrative review of pasta from Italy, Commerce modified its model match methodology because it had determined that its treatment of separate wheat codes in previous determinations lacked consistency. Appx008245; *see also* 12th Administrative Review IDM at cmt. 1. Commerce determined that basing protein content reporting off the packaging label of the pasta product and using a 12.5 percent protein content as a dividing line for premium pasta and

standard pasta provided an objective method to achieve a product comparison on a
"consistent and transparent" basis, in contrast to its earlier method, which relied on
company-specific information and led to inconsistencies.  *Id*.  In seeking to
develop objective criteria that would apply in each subsequent review, Commerce
replaced the wheat code field with new product characteristics, including protein
content.  To categorize the protein content, Commerce chose a protein content
dividing line of 12.5 percent to distinguish between pasta containing premium
semolina and pasta containing standard semolina.  Appx002609-002617.  This
threshold corresponds to the breakpoint for premium versus standard semolina
established by three Italian commodity exchanges:  the Milan Grain Exchange, the
Bologna Grain Exchange, and the Bologna Commodities Exchange.  Appx002614-
002615.

In making these changes, Commerce explained that:  (1) premium pasta
brands have different traits, including semolina content, that are "commercially
significant," (2) the protein content marked on packages is the only known clearly
defined method of identifying pastas, and (3) the 12.5 percent minimum standard
was developed in the Italian industry for pasta manufacturers and semolina sellers.
*Id*.  Appx002613-002617.  Pursuant to the current methodology, established in the
twelfth administrative review, respondents are required to code a "1" for finished
pasta that has a protein content of 12.5 percent or higher (premium pasta), and a

"2" for finished pasta that has a protein content of 10.00-12.49 percent (standard pasta). Appx001257-001258. The "1" or "2" then becomes a digit in the CONNUM for a particular product.

B.   Earlier Challenges To Commerce's Model Match Methodology

In the fifteenth administrative review, when facing the same rounding requirement argument raised in this appeal, Commerce further explained its reasoning for relying upon the information listed on the packaging label for finished pasta, stating that "[b]uyers and sellers examine this information, as listed on the packaging, in determining which products to purchase and/or sell and the appropriate price." Appx008245-008247 (citing *Certain Pasta from Italy*, 78 Fed. Reg. 9,364 (Dep't of Commerce Feb. 8, 2013), and accompanying IDM at Cmt. 4 (15th Administrative Review IDM)). Commerce added that, "because pasta is sold through retail chain to individual customers, there are often many different intermediaries involved in the distribution and sale of finished pasta; each of which need to know the relevant information." Appx008247. Commerce further explained that "our reliance upon the information listed on the packaging of the finished product . . . conforms to our statutory obligation to base our price-to-price comparison on a transparent and consistent basis." *Id.* Finally, Commerce reasoned that, even if a respondent's protein content is slightly lower or higher (*i.e.*, rounded up or down) than shown on the label, these slight differences would

19

not be readily apparent to customers and therefore not commercially significant.

*Id*.

In the twenty-second administrative review, Commerce addressed arguments

from a respondent regarding the differing nitrogen content multipliers between the

United States and Italy.  Appx008247-008248 (citing *Certain Pasta from Italy*, 85

Fed. Reg. 2,714 (Dep't of Commerce Jan. 16, 2020), and accompanying IDM at

Cmt. 1 (22nd Administrative Review IDM).  Although Commerce primarily

rejected the respondent's arguments on separate grounds, Commerce addressed the

issue, explaining that, because "there is not a clearly defined method of identifying

premium pasta other than the protein content marked on the packages,"

Commerce's reliance on the information on packaging labels is an "objective

method to achieve a product comparison on a 'consistent and transparent basis.'"

Appx008248 (citing 22nd Administrative Review IDM).

> C.   Any Minor Differences Caused By The FDA Rounding Requirement
> And Differing Nitrogen Content Multipliers Are Not Commercially
> Significant And Do Not Constitute Compelling Reasons Requiring
> Commerce To Change Its Methodology

As explained above, Commerce is afforded a great deal of discretion in

choosing a model match methodology, and it need not modify that methodology

unless there are "compelling reasons" to do so.  Commerce considers compelling

reasons to exist if a party proves by "'compelling and convincing evidence" that

the existing model-matching criteria 'are not reflective of the merchandise in

question,' that there have been changes in the relevant industry, or that 'there is some other compelling reason present which requires a change.'" *Fagersta*, 577 F. Supp. 2d at 1277 (citation omitted). In addition, "merchandise should be considered to be identical despite the existence of minor differences in physical characteristics, if those minor differences are not commercially significant." *Pesquera Mares*, 266 F.3d at 1384.

In the underlying review, Commerce more than sufficiently explained, with reference to its prior reviews, its continued reliance on the 12.5 percent dividing line and the requirement to report based on the packaging label of the finished pasta product. As Commerce has previously explained, "there is not a clearly defined method of identifying premium pasta other than the protein content marked on the packages." Appx008248. Commerce thus relies on the protein content listed on the packaging label because that is the only consistent and transparent way to assess the physical characteristic of the pasta, and any minor differences caused by the FDA rounding rules and the slightly differing nitrogen content multiplier are not commercially significant. Appx008248-008249.

The trial court has emphasized the importance of transparency and consistency with regard to Commerce's model match methodology for pasta. *See La Molisana S.p.A. v. United States*, No. 16-00047, 2018 WL 3089242 (Ct. Int'l Trade June 21, 2018), *aff'd*, 784 F. App'x 780 (Fed. Cir. 2019) ("La Molisana's

argument is contrary to Commerce's stated policy{regarding transparency and consistency}, and the court must defer to Commerce's concerns regarding the potential for manipulation.").

Plaintiffs-appellants argue that Commerce's current model match methodology results in comparisons between dissimilar products, and that the goals of transparency and consistency cannot override the goal of accuracy when determining protein content of finished pasta.  Applnts. Br. at 15-29.  But, as this Court has held, merchandise is to be considered identical *despite the existence of minor differences in physical characteristics*.  *See Pesquera Mares*, 266 F.3d at 1384.  Thus, any disparities resulting from the FDA rounding requirement and the differing nitrogen content multipliers do not prevent Commerce from making an accurate comparison.  Moreover, as the trial court recognized in its opinion, Commerce asks respondents to code from the information on the packaging labels because doing so "fosters transparency and consistency in CONNUM-building." Appx000050.  The trial court also agreed that plaintiffs-appellants had not demonstrated that the differences in the nitrogen multiplier and rounding were commercially significant.  Appx000049-000050.

As explained above, Commerce determined that reliance on the information on the packaging label was an "objective method to achieve a product comparison on a 'consistent and transparent basis' because all of the physical characteristics

are listed on the product label." Appx008248. And, as remarked upon by the trial court, "{f}or Commerce, there was no evidentiary basis to conclude that differences in nitrogen multipliers and rounding rules, which is not information readily available to customers, mattered in the marketplace." Appx000047; *see also* Appx002615 ("the differences in physical qualities, labeling, pricing and merchandising practices between superior and standard pasta appear to be perceived by customers."). Because the market perception of pasta relies on the details from the product packaging, the differing nitrogen content multiplier standards between the United States and Italy, which are not available for review to the public marketplace and general consumers, have no impact on consumer decisions at the point of purchase and are not commercially significant for the purposes of discerning the foreign like product. Appx008248.

Finally, as the trial court observed, "at best, {plaintiffs-appellants} have offered an alternative conclusion to the one reached by Commerce. {They} have failed to demonstrate that Commerce's conclusion—that values other than those readily available to consumers on the packaging label were not commercially significant—was unreasonable." Appx000050-000051. Even if this Court finds plaintiffs-appellants' claims to have some level of merit, reversal and remand is unwarranted because Commerce's decision was still supported by substantial evidence and reasonably explained in the final results. This is particularly so given

that plaintiffs-appellants have not established that Commerce cannot treat products

with slightly different physical characteristics as identical or proffered an

alternative protein coding methodology that relies on objective, transparent,

consistent criteria rather than internal information from the respondents, which

could result in manipulation and inaccurate product comparisons.  Appx008248-

008249.  Indeed, Commerce changed its methodology *because* relying on

company-specific information from respondents led to a lack of consistency and

clarity.  Appx002609, Appx008245.

III.   The Market Report Is Not Compelling Evidence Requiring A Deviation
       From The Current 12.5 Percent Dividing Line

Plaintiffs-appellants argue that Commerce's 12.5 percent breakpoint for

reporting standard and premium pasta protein content is inconsistent with industry-

wide standards, and that a 13.5 percent dividing line is more appropriate.  Applnts.

Br. at 30-43.  However, the trial court correctly held that plaintiffs-appellants had

failed to demonstrate, by compelling evidence, that the existing breakpoint is not

reflective of the industry; there is no reason to disturb this decision.  Appx000047.

In the underlying administrative proceeding, plaintiffs-appellants submitted

a so-called "market report," created by one of plaintiffs-appellants' counsel, which

included labels and receipts for various pasta products purchased from four

supermarkets in the Washington, DC area, as well as charts purporting to illustrate

a relationship between protein content and price.  Appx002143-002148.  This

report also appended a screenshot purporting to show that the Bologna Grain Exchange defines "superior" semolina as having 13.5 percent or greater protein content. Appx002360. Plaintiffs-appellants claimed, as they do now, that the report is unrebutted in showing that the industry breakpoint for defining premium and standard semolina had changed to 13.5 percent. But, as Commerce correctly determined, and the trial court agreed, this self-serving market report does not rise to the level of substantial evidence constituting a compelling reason for Commerce to revisit its methodology. Appx008249-008250, Appx000048-000050.

As Commerce explained, this report was prepared specifically for this proceeding by plaintiffs-appellants' counsel, who selected the products from a narrow geographic area. Appx008249-008250. As the trial court found, "no serious argument can be made that the report is representative of the entire industry either in the United States or Italy. Appx000047.

Furthermore, in establishing the 12.5 percent breakpoint, Commerce relied on publicly available information and published industry standards for guidance. Appx002614 ("{b}ecause we strive to identify a universal set of criteria which apply to all respondents in this proceeding, we looked to publicly available information and published industry standards for guidance."). The market report, on the other hand, "bears no indicia of having been publicized or published to or by the industry at large." Appx000048. Thus, both Commerce and the trial court

correctly concluded that the market report, which does not indicate an "industry-wide, commercially accepted and recognize{d}" breakpoint of 13.5 percent, but instead purports only to show protein differences in four retail outlets in one limited geographic area based on data generated by an interested party's own counsel, was not a compelling reason necessitating Commerce to change its methodology. *See Fagersta*, 577 F. Supp. 2d at 1277.

Plaintiffs-appellants appear to believe that Commerce must rely on the information in the market report because no party submitted rebuttal comments or other factual information undermining the report.[3] *See* Applnts. Br. at 36. The trial court considered and appropriately rejected this argument, holding that "{j}ust because evidence is unrebutted . . . does not make it substantial." Appx000049. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison*, 305 U.S. at 229. As the trial court explained, "{i}t cannot be said that the Market Report reasonably supports the conclusion" that, industry-wide, the consensus is that the breakpoint is 13.5 percent; Commerce is not required to simply take plaintiffs-appellants' conclusions as undisputed fact. Appx000049. Rather, it was incumbent on the interested parties to affirmatively provide substantial evidence demonstrating that

---

[3] Petitioners did question the validity of the report in their administrative rebuttal brief. Appx007993.

the market report data *are* representative of the wider industry. *See Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1337-38 (Fed. Cir. 2016) ("The burden of creating an adequate record lies with interested parties and not with Commerce."). Finally, as Commerce observed in the final results, "{n}o attempt is made in the Market Report to address the potential for manipulation in choice of purchases{.}" Appx008250. Accordingly, Commerce properly determined the supermarket data in the market report do not constitute compelling evidence for changing the protein content reporting requirement.

Plaintiffs-appellants' reliance on the screenshot of the Bologna Grain Exchange fares no better. As the trial court held, "there is nothing in the report that indicates that this single Bologna exchange represents the entire market or even a large portion of it." Appx000048. In establishing the 12.5 percent breakpoint, Commerce relied on information from three different Italian commodity exchanges. Appx002614-002615. If breakpoint information from other exchanges existed to support their point, plaintiffs-appellants could have provided evidence from those exchanges, rather than just the Bologna Grain Exchange. The information from the Bologna Grain Exchange alone "cannot reasonably be understood to mean that the entire Italian industry as a whole has increased the minimum protein content of premium pasta from 12.5 {percent} to 13.5 {percent.}" Appx000049. Commerce correctly determined that the Bologna

Grain Exchange screenshot did not constitute sufficient evidence of an industry-

wide change in protein measurement standards providing a compelling reason to

change Commerce's longstanding instructions for reporting protein content.

## **CONCLUSION**

For these reasons, we respectfully request that the Court affirm the judgment

of the Court of International Trade.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

/s/ Reginald T. Blades, Jr.
REGINALD T. BLADES, Jr.
Assistant Director

OF COUNSEL:

/s/ Sosun Bae

CHRISTOPHER KIMURA
Office of the Chief Counsel for
Trade Enforcement & Compliance
Department of Commerce

SOSUN BAE
Senior Trial Counsel
U.S. Department of Justice
Civil Division
PO Box 480
Ben Franklin Station
Washington, D.C. 20044
Tell: (202) 305-7568
Fax: (202) 307-0972
Email: sosun.bae@usdoj.gov

November 9, 2023

*Attorneys for Defendant-Appellee*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), I certify under penalty of perjury that the attached brief is proportionately spaced using Microsoft Word, uses a Times New Roman typeface in 14 point font size, and, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), contains 5,840 words.


/s/ Sosun Bae
SOSUN BAE